FIRST DISTRICT
SIXTH DIVISION
FEBRUARY 10, 2011

No. 1-09-0338

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|  | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
|  | ) |  |
| v. | ) | No. 06 CR 19385 |
|  | ) |  |
| MAURICE WARE, | ) | Honorable |
|  | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |
|  | ) |  |

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion.
Presiding Justice Garcia and Justice Cahill concurred in the judgment and opinion.

## OPINION

Following a jury trial in which he represented himself *pro se*, defendant Maurice Ware was convicted of attempted first degree murder and aggravated battery. Defendant's oral motion for a new trial was denied. Defendant was sentenced to 25 years' imprisonment. Defendant appeals, arguing (1) that the trial court denied defendant his constitutional right to counsel by failing to substantially comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) prior to allowing defendant to proceed to trial *pro se*; (2) that the trial court erred in denying defendant standby counsel; and (3) that the trial court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) during jury selection by not properly inquiring into the four *Zehr* factors (*People v. Zehr*, 103 Ill. 2d 472, 477 (1984)). We affirm.

## BACKGROUND

On August 10, 2006, defendant was arrested after an altercation between defendant and

No. 1-09-0338

Quintin Johnson, his neighbor, during which Johnson was stabbed in the back of the head.

Defendant was indicted on charges of attempted first degree murder (720 ILCS 5/8-4(a), 9-1 (West 2006)) and aggravated battery (720 ILCS 5/12-4(a) (West 2006)).

Pre-trial Proceedings

*Judge Wadas*

Defendant was first assigned to the courtroom of Judge Kenneth Wadas, where, on September 20, 2006, Assistant Public Defender (APD) Richard Kruss was appointed to represent defendant. On the same day, defendant requested a different attorney. Defendant told the court that he was "really not comfortable with" APD Kruss, and that APD Kruss "scared [him] literally to death." At defendant's request, APD Kruss filed a petition for substitution of judge, which was granted.

*Judge Salone*

On September 21, 2006, defendant's case was reassigned to Judge Marcus R. Salone, and APD Lakshmi Jha was appointed to represent defendant on that date. On October 5, 2006, APD Jha obtained an order from the trial court allowing defendant access to the law library at the county jail where he was being held. On January 9, 2007, APD Jha obtained a number of orders from the trial court, including orders allowing defendant phone calls to APD Jha twice a week and access to the law library twice a week.

On February 23, 2007, defendant told the trial court that he wished to represent himself. The court admonished defendant that he could be sentenced up to 30 years for attempted first degree murder and that he would be held to the same standard as a licensed attorney; the court

2

"strongly discourage[d]" defendant from representing himself. Defendant responded that the only way he could be discouraged from representing himself was if he was able to have all of the same documents that APD Jha had; the court noted that there were some documents that could not be provided to defendant. The trial court also tested defendant regarding several legal concepts; defendant said that the court was "making [him] feel like a fool," but the court indicated that its purpose was to demonstrate defendant's lack of knowledge. It noted that "[t]here's a whole lot of innocent folks serving a lot of time in the joint because they felt they were the only ones who could represent themselves." However, defendant persisted in representing himself and the court granted APD Jha's motion to withdraw from the case during the February 23, 2007, court date.

Defendant made an oral demand for trial. APD Jha tendered all of the discovery that she had received, with appropriate redactions, to defendant. The State pointed out that there were several items of open discovery remaining, and that if defendant demanded trial, he would not have complete discovery. The case was continued for one week to obtain the missing discovery.

On March 2, 2007, defendant told the court that he had lost his legal papers because of "some extreme things going on" at the jail and requested an "assistant to counsel." The trial court told defendant that it would not appoint him an attorney as an assistant, but could appoint an attorney if he desired an attorney to represent him at trial. Defendant said that "all this here is a charade," and that "[a]ll this stuff is being manufactured against" him. He said that he needed someone "who can come and see me, stay in constant communication with me and let me know the progress of the case"; he clarified that he was seeking an attorney who would communicate with him "to the point where they know me as an individual, not as a case file."

3

Defendant further stated that "[t]his is a game these people are playing with me in here. *** These people are unfeeling. These people don't have no feelings. *** These people don't care nothing about the public, they only care about their own self-seeking self-interest and I know it and you know it." The trial court asked defendant whether he wanted a lawyer, and defendant said that he did. APD Jha advised the court that if she was being reappointed, she was not prepared to proceed to trial because of the missing discovery. APD Jha was reappointed to represent defendant and the case was continued.

On April 2, 2007, APD Jha acknowledged receipt of additional discovery and requested the court enter an order for a forensic clinical examination (BCX) to determine whether defendant was fit to stand trial. Defendant was not pleased with that request and told the court that he did not want APD Jha to represent him, stating that he did not feel as though she had his best interests at heart. The trial court informed defendant that it would not be able to assign another APD, and defendant responded that he would then proceed *pro se*. The trial court then allowed APD Jha to withdraw and admonished defendant of the minimum and maximum sentences for the crimes with which he had been charged and admonished that if defendant represented himself, "[he] will have to comply with the rules of evidence and conduct [him]self in a manner in which those who have been licensed to practice conduct themselves."

The trial court advised defendant that it had received a phone call from the law librarian, indicating that defendant had made threats and requesting that his access to the law library be reduced to once a week. Defendant told the court that he had composed a letter to APD Jha telling her of his unhappiness with her representation, and he told the court that there was a

4

pattern of people preventing him from accessing the law library. The State then requested a BCX based on defendant's conduct in court.

On April 9, 2007, defendant, acting as his own attorney, requested investigators and legal assistance for "motions and advice and stuff like that"; defendant emphasized that he was not asking that a public defender be appointed to represent him. The trial court denied his request, saying that the only investigator available was through the public defender's office. The trial court asked defendant whether his issue was with APD Jha or with the public defender's office as a whole. Defendant responded that he only had problems with APD Jha. The trial court advised defendant that if he was to reappoint the public defender, defendant would be assigned APD Jha again, and suggested that defendant speak to Amy Campanelli, a supervisor at the public defender's office, to determine if she could assign his case to a different APD.

On April 17, 2007, defendant accepted receipt of additional discovery tendered by the State, asking whether they were "under Rule 412 (C), (D), and (E)";[1] the State did not respond to defendant's question. Defendant requested a continuance so that he could review the documents and obtain counsel. On May 30, 3007, defendant told the court that he needed assistance of counsel, and when the court asked if an assistant public defender should be appointed, defendant responded: "Look like I'm forced to have to go along with that because I have no resources in my position right now. In the position I'm in right now, I don't have the resources to do the things I need to do." Defendant also said that if APD Jha was assigned as his attorney, "it would be

---

[1] Supreme Court Rule 412 concerns disclosure of discovery to an accused. Ill. S. Ct. R. 412 (eff. Mar. 1, 2001).

probably under conditions," and stated that he was most concerned about disclosure and communication, quoting several rules of professional conduct. Defendant appeared again the next day, and advised that he would accept APD Jha "under strict conditions," including that she make no stipulations with the State without defendant's knowledge and consent, that she visit defendant at the jail between court dates, and that she "absolutely and imperatively defend and protect [defendant's] rights." APD Jha was reappointed on May 31, 2007.

On July 3, 2007, defendant again complained about APD Jha and about his treatment in jail. He said that APD Jha was "totally numb to what's going on to me. She ain't trying to hear nothing I'm saying. *** Every time she comes on board, I get treated real bogusly over there." Defendant also claimed that the State had exculpatory evidence that was being hidden from him. The trial court continued the case.

On July 20, 2007, APD Jha's supervisor, Amy Campanelli, requested a BCX on APD Jha's behalf to determine defendant's fitness to stand trial. Defendant was "strongly opposed" to the BCX. When the trial court asked him whether he wished to represent himself, defendant stated that he was "being forced and bullied into representing myself and I can't do that. ***  I don't have the resources to represent myself. And because of that I'm being forced to take *** an attorney from the Public Defender's Office. ***  Y'all go ahead and do what y'all wanna do for me, but the Public Defender's Office is not representing me."

Defendant was evaluated by a forensic psychiatrist on July 31, 2007, and the psychiatrist opined that defendant was fit to stand trial; in his report, the psychiatrist noted that defendant's evaluation "does not reveal the presence of a psychotic disorder, a mood disorder, a cognitive

disorder, or other mental disorder that interferes with his fitness to stand trial," and opined that defendant's "lack of cooperation with his current public defender is likely volitional and due to his personality disorder." The forensic psychiatrist did not specify what "personality disorder" defendant had.

On September 18, 2007, the trial court again allowed the withdrawal of APD Jha. Defendant stated that APD Jha was "way too overburdened with other things to represent [him] sufficiently," but he wanted it made clear that he was "not going pro se because I want to represent myself because I am really unable to do that without assistance." Defendant also stated that he felt that he was unable to secure a fair trial in the courtroom because of his "reoccurring conflicts of interest" with APD Jha. Judge Salone then recused himself and transferred the case to the presiding judge for reassignment. The case was assigned to Judge Stanley Sacks.

*Judge Sacks*

On October 29, 2007, defendant appeared before Judge Stanley Sacks and was represented by APD Daniel Gallagher.[2] Defendant advised the court that Gallagher was "fired" and that defendant would be "going pro se right now." The court confirmed that defendant had been *pro se* at one point when the case was before Judge Salone and questioned defendant regarding his age and educational background; defendant answered that he was turning 42 shortly

---

[2] The record does not specify the date that APD Gallagher was appointed, or by whom, but the trial court made a reference to APD Gallagher having been defendant's counsel for approximately one month prior to the October 29, 2007, court date and also noted that the first time defendant came before Judge Sacks was on September 19, 2007.

7

and that he had not finished eighth grade, although he did receive a GED. Defendant told the court that Gallagher was "very aggressive," "seems like he's trying to provoke me into anger all the time," and did not have a "peachy disposition." The trial court asked the State about defendant's criminal history, and admonished defendant about (1) the nature of the charges against him, (2) the minimum and maximum sentences for each charge, and (3) the right to have an attorney and, if necessary, the court would appoint an attorney for him. Defendant responded to the trial court's questioning by stating that he understood each of the court's statements. He also repeatedly stated that he was being "forced to go pro se," but the trial court found that there was no basis in the record for that claim.

The trial court further advised defendant that if he chose to proceed *pro se*, there was more to presenting a defense than "merely telling your story." The trial court noted that presenting a defense required adherence to legal rules, that the State would be represented by an experienced attorney, and that a defendant proceeding *pro se* could give the State an advantage should he fail to object when appropriate or should he make a poor tactical decisions because he is unaware of the rules. The trial court also admonished defendant that if he proceeded *pro se*, he would not be able to challenge the competency of his representation on appeal and that defendant would not receive any special treatment as a result of his election to proceed *pro se*. The following colloquy then took place:

> "THE COURT: [T]he court, meaning myself, will not
>
> appoint standby counsel to assist you during the course of trial. Do
>
> you understand that?

8

DEFENDANT: Yes.

THE COURT: In other words, Mr. Ware, if you decide to go pro se, you go pro se. There will not be an attorney sitting there to advise you. There will not be a combination of having a lawyer and going pro se at the same time. If you want to go pro se, which is your right to do that, there will not be a lawyer to assist you, do you understand that?

DEFENDANT: Yes, sir."

After the trial court's admonishments, defendant questioned how he could be confident that his counsel was competent if he was unable to communicate with his attorney. He asserted that the public defenders were not advocates but were "adversary to the defendants." The court pointed out that APD Gallagher had only been defendant's APD for a month and that defendant should give APD Gallagher more time. The court also stated that APD Gallagher was a "fine lawyer" and that the trial court would not assign a different attorney. The court asked defendant again if he wished to proceed *pro se*, and defendant responded, "No." After defendant had spoken with APD Gallagher during a break in the proceedings, defendant told the court:

"Mr. Gallagher is adversary to me. He puts on one show here in the courtroom and another back in the back. All I'm asking Judge Sacks is that another attorney be appointed to me other than him. He is not going to work. I know he does not have my best interest at heart, sir. I'm not asking to go pro se because I can't

handle this, you know, very well. That I cannot. But at the same time, I am not going to be stuck with someone who I know for a fact who will handle my case in a very perfunctory way. I'm not going to go for that. I'm sorry, sir, if that upsets the court, then so be it.

* * *

He will never represent me."

On October 30, 2007, the trial court allowed APD Gallagher to withdraw and appointed APD Adrienne Davis to represent defendant. On November 20, 2007, defendant complained about APD Davis' visit to the jail. Defendant stated that APD Davis and APD Victor Erbring made a "very, very brief" visit, and APD Davis had "a fleeting lackadaisical perspective or demeanor" concerning defendant. Defendant said that he was uncomfortable with APD Davis and APD Erbring, that they scared him, and that APD Davis would not file a motion that defendant wished to file. The court told defendant, "You can't get along with anybody at all." Defendant stated that the attorneys who had been appointed were "not concerned about protecting [his] constitutionally guaranteed right." Defendant asked if he would be able to have counsel other than the public defender's office. The trial court responded, "[y]ou are not entitled to it. You are entitled to a lawyer, if you can't afford one. You are not entitled to pick who the lawyer would be." Defendant stated that he felt he was being forced into a corner. Defendant accused the court of being biased against him; the court denied any bias or prejudice toward defendant. Defendant then asked for additional time to hire an attorney, which the trial court granted.

On December 3, 2007, defendant requested another continuance, stating that his mail was being intercepted at the jail so he was unable to contact any attorneys. On January 11, 2008, defendant had still not retained counsel and received another continuance. Defendant also read a statement to the court:

"Because I'm unable to procure an attorney, for reasons way beyond my control, which at present places me in a Hobson's choice, to take appointed counsel or not to take appointed counsel. That's the question.

My good instincts are telling me not to and that's only because of prior experiences with Richard Kruss, Lakshmi Jha, Victor Erbring, Daniel Gallagher and Adrienne Davis. All of which have been anything but advocates for my cause. For example, all of them have vehemently denied and deprived me of their effective assistance of counsel by obscuring facts, refusing to file relevant motions, trying to force me to go with a failed defense in which their predecessor came up with without thoroughly investigating my charging instruments. Vaguely answering valid questions and concerns and totally failing to adhere to Article Eight Illinois Rules of Professional Conduct, which I sincerely doubt they even know, let alone practice.

In addition to that, they totally refuse to show me indepth

[*sic*] and volume the full extent of my discovery as though they

were, they are deliberately hiding very pertinent information,

exculpatory evidence. That is critically vital in establishing my

innocence.

So to actually have the public defender office represent me

in this critical matter would be an extreme manifest constitutional

error and obstruction of authentic true justice."

Defendant continued: "no, I do not want to represent myself. But [I] will not be forced or made

to take assistance of counsel who don't understand or refuse to acknowledge the true definition of

assistance of counsel." He also indicated that he was challenging the constitutionality and validity

of his indictment, bail, and illegal detention. The trial court told defendant that he could have as

much time as he needed to obtain counsel, and continued the case.

On January 25, 2008, defendant informed the court that he did not have an attorney, that

APD Davis was not going to be representing him, and that he would be proceeding *pro se*. The

court inquired into defendant's age, educational background, and criminal history. The court then

admonished defendant about (1) the nature of the charges against him, (2) the minimum and

maximum sentences for each charge, and (3) defendant's right to counsel, or to have counsel

appointed to him if necessary. Defendant responded that he understood all of the court's

statements, but regarding his right to an attorney, said that his problems with the public defender's

office was affecting his decision to proceed *pro se*. The court said that defendant's other options

were to hire an attorney or proceed *pro se*; the trial court noted that APD Davis was a "very fine

lawyer," as was APD Erbring. Defendant responded that he was "damned if I do and then damned if I don't. What kind of choice is that up under the Constitution?"

Defendant accused the court of having a "hidden agenda." He claimed he was not comfortable with the court because "[y]ou don't have my best interest at heart as a fact finder. You're too busy trying to cover up these people here that are bogus with malfeasance and legal malpractice." Defendant also called the court "a poor example of a fact-finder." The court asked whether defendant understood his right to have a lawyer appointed, and defendant asked the court: "I'm having a problem with the Public Defender's Office, and I can't afford a lawyer. And I don't really want to go pro se, but I'm being forced to go pro se."

The court admonished defendant that presenting a defense was more than simply telling a story, that he would need to comply with technical rules, that an experienced attorney would be representing the State, that defendant might be at a disadvantage with his lack of knowledge of legal matters, that he would not receive any special treatment, and that he would not be able to appeal based on the competency of his counsel. When the court told defendant that once defendant was allowed to proceed *pro se*, he would not be able to change his mind during the course of the trial, defendant responded:

> "DEFENDANT: No, I don't understand that. You mean to
>
> tell me that, you know, that I would not have an opportunity to
>
> have any assistance of legal counsel if I'm in terrible need of it,
>
> right? That's what you're telling me?
>
> THE COURT: In the event the court accepts your decision

13

to represent yourself, you are not given a chance to change your mind during the course of the trial. Once the trial starts, you're pro se and that's the way it remains.

DEFENDANT: Once the trial starts.

THE COURT: Correct.

DEFENDANT: Okay.

THE COURT: Do you understand that?

DEFENDANT: Yes.

THE COURT: That the court -- if the court in its discretion is not going to appoint stand-by counsel, which I will not, that I informed you that there would be no stand-by counsel to assist you during the course of the trial.

Do you understand that?

DEFENDANT: I don't understand why.

THE COURT: Did you understand what I said?

DEFENDANT: I understand what you say, but I still don't understand why.

THE COURT: Because if a man wants to go pro se, he goes pro se. If he wants a lawyer, he has a lawyer, not a combination of both.

If you want a lawyer, you can get one or stay with Ms.

> Davis; or if you want to go pro se, you can go pro se.  I will not
>
> appoint the lawyer to stand by and act as stand-by counsel for you.
>
> Do you understand that?
>
> DEFENDANT: Yeah."

Defendant then decided to proceed *pro se*, and the trial court allowed APD Davis to withdraw on January 25, 2008.  Defendant accepted the discovery tendered to him by the State, and asked the State whether it was in compliance with Supreme Court Rule 412; the State said that it was.  The case was then continued so that defendant could review the discovery.

On February 15, 2008, defendant again appeared before the court.  The trial court asked defendant if he wanted APD Davis as his attorney, and defendant said that he did, subject to some "reasonably stringent conditions."  Defendant then read 11 "conditions," including (1) that APD Davis not pursue the defense that APD Jha had pursued; (2) that APD Davis comply with article 8 of the Illinois Rules of Professional Conduct and realize that her duty and loyalty was to defendant and not to "her cronies and quid pro quo patronage system, hidden rules, quid pro quo buddies"; (3) that APD Davis not enter into any stipulations with the State without defendant's knowledge; (4) that APD Davis file several motions on defendant's behalf and obtain transcripts of defendant's court appearances; (5) that APD Davis arrange for an expert to examine the State's evidence; (6) that APD Davis not engage in any "fleeting attorney visits especially with Victor Erbring, Daniel Gallagher, Richard Kruss, Lakshmi Jha nor Amy Campanelli, period"; and (7) that APD Davis "assure[] me *** that she will without a doubt protect my rights as a citizen of the United States and State of Illinois."  The trial court stated that it would not appoint APD

15

No. 1-09-0338

Davis and impose conditions on her representation. Defendant responded:

"The last time I was here I was in your courtroom, I made mention of my extreme discomfort in you [p]residing over my case. Your condescending decorum, your odious expressions, your dark and very offensive sarcasm and your complete, apathetic inability to comprehend the grievous hardships that I am being, one, timely subjected to -- to is quite alarming. And the only thing that supersedes your poorly restrained and transparent bias and prejudice is your primitive apathy and deliberate willingness to help selective Gestapo enforcement and selective final prosecution that is being perpetrated against me to obstruct, abridge, deprive and circumvent my Constitutional guaranteed rights as a citizen of the United States, State of Illinois, which is a clear violation of my 14th Amendment, especially when your public pretenders and persecutors' motives are primarily predicated on cronyism, quid pro quo, which is a sort of a patronage system and vindictive, maligned, libelous slander especially designed to discredit and black list me simply because I am very adamant and vocal about exercising my protected rights under the law."

The court repeated that he would reappoint APD Davis, but not under conditions. Defendant then said that he did not believe that the court had his best interests at heart and asked

16

for another judge. The court told defendant that if he wished to file a motion for substitution of judge, he could do so in writing, and read the statutory requirements to defendant. The State asked for a BCX, stating that after listening to defendant's statements, there was "a bona fide doubt about the defendant's mental health." Defendant asked that an attorney be appointed on the condition that no BCX be performed. The court repeated that it would not impose any conditions on appointed counsel. Defendant asked the court to reappoint APD Davis on February 15, 2008.

After a break in the proceedings on the same date, APD Davis informed the court what had occurred during the break: "I informed Mr. Ware that based on what occurred in court before, that I would be asking for a Forensic Clinical Services evaluation. Mr. Ware told me I was fired." Defendant responded, "Absolutely." Defendant explained that he was being forced to do things he did not want to do, and the court stated that it would "take that to mean" that defendant was proceeding *pro se*; the court denied the State's request for a BCX, saying that "[o]ne of the issues is whether he understands the nature of the charges and to cooperate with an attorney in his own defense. Since he is going pro se, that becomes an issue, which is not before me at the time, whether he has a lawyer in his own defense. He is his own defense. So I am not going to order a fitness examination at this point." Defendant asked whether it would be possible for him to have an appointed attorney other than APD Davis or APD Gallagher, and the court said it was not. Defendant responded that the court was forcing him to be represented by public defenders who were "obviously adverse" to him. Defendant stated that he was being forced to proceed *pro se* even though he wanted legal representation, stating he simply wanted "good legal

representation."

The case was continued several times for the defendant to obtain legal representation. On March 14, 2008, the State asked the judge to enter an order for BCX to determine whether defendant was fit to stand trial. Defendant was evaluated on March 25, 2008, by the same forensic psychiatrist that had evaluated defendant in 2007, and once again the psychiatrist reported that defendant was "presently fit to stand trial." Again, the psychiatrist opined that defendant's "lack of cooperation with his current public defender is likely volitional and due to his personality disorder." The forensic psychiatrist did not explain what defendant's "personality disorder" was.

On April 15, 2008, defendant requested a copy of his BCX, which he received. Defendant requested more time to find counsel, even asking the people in the courtroom if there was an attorney present that he could hire. Defendant also complained about APD Gallagher's conduct, saying that he was "constantly harassing" defendant and causing "commotion" between defendant and the other detainees. Defendant stated that the public defenders who had been appointed to represent him had not protected his rights but had violated them, calling the public defender a "public pretender." Defendant once again told the court that it was not acting in defendant's best interest, calling the courtroom a "renegade courtroom" and telling the court that it was "out of order." The court provided defendant with the statutory citation for requesting a substitution of judge.

On April 25, 2008, defendant requested transcripts from his prior court appearances, which the trial court denied. Defendant then requested an appointed attorney, and the court

agreed to set a court date to appoint an attorney. During the exchange, defendant repeatedly referred to the trial court as "Masser," and the State noted that his behavior was the type of "purposeful behavior" referred to in the BCX. Defendant became angry that the trial court was allowing "derogatory" comments from the State. The case was continued until May 8, with defendant telling the court to "[w]atch your mouth" and calling it a "[c]hump."

On May 8, 2008, the trial court provided defendant an opportunity to speak with private attorney David Weiner. On May 30, 2008, Weiner told the court that he would not be filing an appearance on the case because defendant told Weiner that the only way that he would accept Weiner was if Weiner filed a motion for substitution of judge, which Weiner refused to do. Defendant said that Weiner was a "personal friend" of the trial court, later calling Weiner one of the court's "drinking buddies," and said that Weiner "had alcohol on his breath talking." The trial court denied having a relationship with Weiner. Defendant again stated that he was being forced to proceed *pro se* "because for some reason I am not being appointed a lawyer, you know what I am saying, who is totally independent of you and this county."

Defendant repeated his accusations that he could not receive a fair trial in the courtroom, and the trial court again told defendant that he had the right to file a motion for substitution of judge. Defendant responded that he could not file the motion because the court refused to order the jail to allow defendant access to the law library, and accused the court of letting its personal feelings interfere with its decisions.

Defendant also requested stand-by counsel:

"DEFENDANT: I am electing -- I am being forced to elect

19

pro se status, and I need stand-by counsel, sir.

THE COURT: I told you when I advised you earlier a long time ago, I am not appointing stand-by counsel. You go pro se, you go pro se.

DEFENDANT: Isn't it *** one of my constitutionally guaranteed rights to have, you know what I am saying, stand-by counsel. Isn't that a part of the process?

THE COURT: No, it is not, Mr. Ware.

DEFENDANT: It is not?

THE COURT: No.

DEFENDANT: So you mean to tell me I have to go through this process without any counseling from an attorney? That is what you are saying to me, Judge Sacks.

THE COURT: That is not what I am saying.

DEFENDANT: What are you saying?

* * *

THE COURT: You were told and the law is clear, you don't have a right to stand-by counsel. I have given you months to get a lawyer of your own. You weren't able to do that."

Defendant next appeared before the court on June 6, 2008. Defendant asked the court to appoint him an attorney, stating that his "success trying to procure a lawyer has been again

20

thwarted by the personnel in Division 9" of the jail. Defendant then made a lengthy speech about the bias of the court and the prosecutors, and the ineffectiveness of the public defenders appointed to his case. The court continued the case to June 19, 2008, to appoint an attorney.

On June 19, 2008, the trial court indicated that it had spoken with private attorney Richard Kloak about representing defendant. Defendant responded that he had not yet spoken with Kloak. After defendant engaged in a conversation with the court about defendant's conditions in jail, the trial court continued the case again. On June 27, 2008, the trial court told defendant that it would ask private attorneys Richard Kloak and Brian Dosch to speak with defendant, and if defendant approved of one of them, the court would appoint him to represent defendant. Defendant agreed, and also asked to speak with private attorney Robert Johnson. Defendant also apologized for his behavior at the last court date.

On July 11, 2008, Dosch told the court that he had spoken to defendant at length at the jail, where defendant wanted Dosch to come to a "certain understanding." Dosch agreed, with certain stipulations. Defendant told the court that he could not make a decision because he had not yet spoken with Johnson. The court told defendant that he could speak to Johnson, but that the court would not appoint him. After a break in the proceedings, the trial court agreed to allow defendant to speak to Johnson and to appoint Johnson. However, the court warned defendant: "That's the last lawyer you are going to go through. If he wants to take the case, I will give you Robert Johnson. *** If he doesn't want your case or you don't want him, then that's it."

On July 18, 2008, as defendant was escorted out of the courtroom by a deputy sheriff, defendant called the judge a racist. The court also indicated that Johnson had spoken to

defendant, and defendant asked Johnson for a pen. Johnson refused to give defendant a pen, because it was against the rules to provide pens to inmates, and defendant said that he did not want Johnson to represent him.

On July 24, 2008, the court prepared and filed a motion for substitution of judge for cause on defendant's behalf, and the case was transferred to the supervising judge for hearing. The motion was heard the same day, and the supervising judge denied defendant's motion and transferred the case back to Judge Sacks; defendant called the hearing on the motion a "sham." Defendant asked for a continuance, and the trial court told him that on the new date the court would be setting the case for trial. Defendant objected, saying that he was not prepared to proceed to trial and that he needed an attorney. The court told defendant that the case had been ongoing for two years, that defendant had rejected a number of attorneys, and that "[t]he case cannot go on forever."

Defendant next appeared before the court on August 15, 2008. The court again recounted the proceedings in the case, including the fact that defendant had rejected seven or eight different attorneys. The trial court asked defendant if he would like a trial, and defendant responded that he was not in a position to proceed to trial without an attorney. Defendant again gave a lengthy speech about the attorneys who had been assigned to him and the ways that the court was violating his constitutional rights, including forcing defendant to proceed *pro se*. The trial court set jury selection for September 26, 2008, and defendant told the court that he wanted private attorney Brian Dosch to be his attorney. The court told defendant that if defendant did not appear in court on September 26, the case would be tried without him, and defendant was removed from

the courtroom while uttering obscenities and threats to the judge.

On August 22, 2008, the trial court asked Dosch to visit defendant again regarding the representation, and Dosch and defendant met again at the jail, where they agreed that Dosch would prepare a motion to dismiss the indictment and a motion to quash the arrest, as well as discussing how to proceed with the evidence and the case.

On September 8, 2008, the trial court appointed Dosch to represent defendant after defendant informed the court that he wanted Dosch as his attorney "[f]or now." On September 15, 2008, Dosch told the judge that he wished to file a motion to quash arrest and suppress evidence, as well as having the judge sign several orders regarding defendant's telephone and library access and asking for defendant to be moved to a different area of the jail. The court refused to sign the orders involving conditions at the jail. Defendant complained that the court was preventing his attorney from being effective. The trial court set the date for hearing on the motion for October 3, 2008, and told Dosch to file the motion in the interim.

Dosch filed the motion to quash arrest and suppress evidence on September 22, 2008, claiming that defendant's arrest was made without authority or probable cause. Dosch also filed a motion to dismiss the indictment. On October 2, 2008, Dosch again met with defendant at the jail, and defendant now told Dosch he did not want to proceed with the motion to quash the arrest.

On October 3, 2008, the trial court held a hearing on defendant's motion to quash arrest and suppress evidence and his motion to dismiss the indictment. Chicago police officer Kenneth Young, Jr., testified at the hearing. The court denied defendant's motion to quash the arrest and

23

suppress evidence, finding that there was probable cause to arrest defendant. The trial court also denied defendant's motion to dismiss the indictment.

On October 9, 2008, Dosch visited defendant at the jail, where defendant claimed that Dosch had embarrassed him and told Dosch that he was " 'totally and completely fired.' " On October 30, 2008, Dosch filed a motion to withdraw from defendant's case, including a claim that "there are many conflicts between Mr. Ware and myself and [I] find it too difficult to give him effective representation without his consent and cooperation." Defendant told the trial court that "Mr. Dosch was not representing me in the first place, he was misrepresenting me." The trial court granted Dosch leave to withdraw.

Defendant then read the trial court an article published in the October 6 edition of the Chicago Tribune that was written about defendant's conduct in court, including a statement from the trial court that " 'I'm sick of this guy.' " Defendant continued, stating that the court was biased against him and did not care about his rights; defendant told the court that "the proceedings in this courtroom are liken [*sic*] to Thomas J. Maloney,"[3] at which point the court stated, "[t]hat will cost you six months for that crack once we're done." Defendant then said that he was asking for a substitution for judge and a change of venue, saying that "I need to be

---

[3] According to the court in its order of contempt, "Thomas J. Maloney has the dubious distinction of being the only Illinois judge ever convicted for fixing a murder case.

Maloney was convicted of racketeering conspiracy, racketeering, extortion under color of official right, and obstruction. These convictions arose from his conduct in accepting thousands of dollars in bribes for fixing three murder cases and a fourth felony case."

24

somewhere where I can actually get a fair trial if I'm going to go to trial. I need to go somewhere, I need to be in front of a Judge, you know what I'm saying, who will actually exercise sound judgment." He continued, saying that his life was in jeopardy because of the personnel at the jail, and asked for an escort to court. After defendant was finished with his comments, the trial court told him that it had "bent over backwards" for defendant, recounting the number of attorneys it had provided. The court then advised defendant:

> "THE COURT: You don't want Mr. Dosch any longer, he doesn't want you any longer at this point so again you're going pro se.
>
> DEFENDANT: Forced to go pro se.
>
> THE COURT: Whatever you want to call it."

The trial court further opined that "it is my opinion from you being before me for all of these months and actually now into the second year already that you do not wish to go to trial, that is my viewpoint." The trial court then set the case for trial on December 15, 2008.

On December 15, 2008, Judge Sacks entered an order of direct criminal contempt, sentencing defendant to five months' imprisonment consecutive to the sentence on his conviction, based on the conduct that occurred on October 30, 2008. In his order, the judge found that defendant's conduct during the October 30 status hearing was "loud" and "accusatory," and that defendant "continuously made allegations of impropriety against the court, counsel, court personnel, the sheriffs in court and those at the jail." The judge further found that defendant's conduct, particularly defendant's accusations that the court was the cause of defendant's

25

problems in court and at the jail and defendant's comment likening the proceedings in the court to Thomas J. Maloney, "impeded and interrupted the proceedings, lessened the dignity of the court, and tended to bring the administration of justice into disrepute."

Trial

On December 15, 2008, defendant told the court that he was not ready for trial because he needed an attorney. He again stated that he would not be able to have a fair trial and that he fired all of his attorneys because they were not representing him effectively. He also told the court that he had no idea of how to pick a jury or to cross-examine a witness. Defendant said that he was "strongly opposed" to picking a jury and "strongly object[ed] to these kangaroo proceedings." The court again recalled the list of attorneys that had been offered to defendant. The court asked defendant if he had any witnesses he wished to add to the State's list, and defendant responded, "You got to be joking, right?" Defendant asked the court for the "elements of the case," and the court admonished defendant of the charges and said that defendant would be provided with a copy of the charges if he did not have one.

The court advised defendant of the procedure for selecting a jury. When the venire were brought into the courtroom, the court explained to them about jury service generally, about the charges brought against defendant, and about their responsibilities. During its explanation, the court stated:

> "Under the law, the Defendant is innocent of the charges
> 
> against him, and that presumption remains [with] him throughout
> 
> every stage of the trial and during your deliberations and is not

26

overcome unless you are all convinced beyond a reasonable doubt that he is guilty. The State, in this case Ms. Gambino [and] Ms. Rosen, has the burden of proving this case beyond a reasonable doubt, and that stays on the State. The Defendant is not required to prove the charges against him. He is not required to call witnesses or testify on his [own] behalf. He may rely upon the presumption of innocence."

Later, the trial court continued:

"There are certain principles that apply in a criminal case, and, of course, apply to the case of People versus Maurice Ware. One of those principles is that the Defendant, Maurice Ware, has the presumption of innocence with him, and that remains with him and is not overcome unless by your verdict that the State has proven him guilty beyond a reasonable doubt. Does anybody have any difficulty with the principle that an accused person is innocent of the charges against them? No response.

In conjunction with that is the additional one, that the State, Ms. Gambino and Ms. Rosen in this case, has the burden of proof beyond a reasonable doubt, and that burden stays on the State throughout the entire trial. The Defendant is not required to prove that he is innocent of the charges against him. Does anyone have

27

any difficulty with the principle that the State must prove guilt beyond a reasonable doubt, that the Defendant must prove nothing to you? Again, no response.

In conjunction with those two principles is the additional one that the Defendant, Mr. Maurice Ware, has the absolute right to remain silent, and he may sit here and not testify and rely on his presumption of innocence. If that were to occur, you are to draw no inference either in favor of Mr. Ware or against Mr. Ware because he chooses to remain silent. Does anyone have any difficulty with the principle that an accused person has the absolute right to remain silent and not testify? Again, no response.

If at the close of all the evidence in the case, the arguments by the lawyers, instructions by me, you come to the conclusion that the State has proven guilt beyond a reasonable doubt, under those circumstances, does anybody have any problem signing a verdict form in this case that would say guilty? No response.

The other side of the coin applies equally as well. At the end of all the evidence in the case, the arguments by the lawyers, instructions by me, you come to the conclusion that the State has not proven guilt beyond a reasonable doubt, under those circumstances, does anyone have any problem signing a verdict

28

form which would say not guilty? Again, no response."

The trial court then called a group of 14 venirepeople and questioned them individually about their backgrounds. Neither defendant nor the State asked any questions of the venire.

The State, defendant, and the trial court then discussed the group of 14 venirepeople, with defendant beginning by stating, "Contrary to popular belief, I really don't know what it is I am suppose[d] to be doing right now at this point." The court explained the procedure for selecting the jury. Defendant stated that none of the venire was from his neighborhood, and the court responded that they represented a cross-section of the community. Defendant also asked questions concerning the elements of the crime and the procedure for excluding witnesses from the courtroom. Defendant requested to remove a juror for cause, which was denied, then used three peremptory challenges on the first four venirepeople, and two peremptory challenges on the next four.

When the State, defendant, and the court discussed the second group of 14 venirepeople, defendant again mentioned that they were "not from my cross section and can't identify with none of my realities," and mentioned "the Duran test."[4] They then selected the rest of the jury, including two alternates.

At the end of jury selection, defendant asked the court, "[w]ho can the Defense have an an expert witness? I haven't had an opportunity to get any of those things." The court responded that defendant should "bring it to my attention tomorrow. You have been in custody over two years, gone through seven lawyers."

---

[4] There was no explanation in the record of the "Duran test."

On December 16, 2008, defendant appeared before the trial court for trial. Prior to bringing in the jury, defendant again told the court that "I emphatically don't know what I am doing" and that he was "in dire need of assistance of counsel." Defendant also asked the court to exclude witnesses from the courtroom during opening statements, and the court agreed. The court also told defendant that "[i]t is my viewpoint from watching you all these months that you have been here that you know exactly what you are doing." Defendant objected to that statement. Defendant also chose to wear his jail uniform and not street clothes, saying that "if I put on any street clothes, I will be masking the type of mischaracter of justice here."

Both the State and defendant gave opening statements to the jury. Defendant set forth a theory of self-defense, including statements that Quintin Johnson was drunk and had cannabis in his blood at the time of the incident.

The State's first witness was Regina Snow, Johnson's wife. Snow testified that she and Johnson lived in the same two-story apartment building as defendant, with Snow and Johnson occupying the apartment on the first floor and defendant occupying the apartment on the second floor. The apartments shared a common entry door to the building. Snow described the relationship between them as "neighborly."

Snow testified that in August 2006, the common entry door was often left unlocked and open during the night. Snow wrote defendant a letter and asked him to lock the doors after midnight or when it became dark; Snow left the letter on defendant's door. The same day, Snow discovered the note on the floor in front of her apartment door.

On the night of the incident, Snow and Johnson were sleeping in their apartment. At

30

approximately 10 or 10:30 p.m., Johnson woke up to use the bathroom and informed Snow that the front door to the building was open; Snow confirmed that the door was open because she was able to see light from the porch under their door.

Snow further testified that Johnson went up to defendant's apartment to ask him not to leave the door open at night. Snow heard Johnson knock on defendant's door and heard Johnson speaking; she did not hear any other voices. Snow heard Johnson screaming, then heard a banging noise, which she categorized as "some movement, a commotion." Johnson returned to their apartment, holding his hand to his head. Snow testified that blood was "seeping out of the back of his head." She then pressed a folded towel to Johnson's head and called 911.

Snow testified that after Johnson returned to the apartment and closed the door, she heard someone walk down the stairs and run out the door. She denied that she and Johnson had consumed any alcoholic beverages, and she did not smell any alcohol on Johnson's breath before he went to defendant's apartment. Snow also testified that when Johnson went to defendant's apartment, he was bare-chested, wearing only "gym shorts and flip flops"; he was not carrying anything.

On cross-examination, Snow testified that the light at the bottom of the stairs was turned off on the night of the incident. She further testified that when the police came, she met them at the door and told them that Johnson had been stabbed by defendant, and the police went upstairs. She acknowledged that she and Johnson drank alcohol occasionally, but said that they were not heavy drinkers. She also acknowledged that "there might have been some marijuana." Snow further testified that sometime before the incident on August 10, there had been a "falling out"

31

between defendant, Snow, and Johnson, and that since then, they had not interacted.

The State's second witness was Johnson. Like Snow, Johnson testified that on the night of August 10, he woke up and saw that the common door was open because he was able to observe the light under his door. He decided to go upstairs to speak with defendant, and wore a pair of athletic shorts and flip flops; Johnson was shirtless and did not take a knife or other weapon upstairs with him. When he went upstairs, the light at the top of the stairs was on. Johnson knocked on defendant's door, and defendant asked who was at the door; Johnson identified himself as "Q." Defendant opened the door; Johnson testified that defendant was clothed. Johnson did not see a woman inside the apartment.

Johnson testified that he was several feet away from the door, and that defendant faced him at an angle so that Johnson could not see defendant's right hand. Johnson asked defendant to keep the common door closed, and defendant responded by swearing at him and telling him to leave his doorway. Johnson turned, attempting to leave. Defendant then lunged at Johnson; Johnson did not see defendant lunge but felt it instinctively. Johnson raised his left arm over his head and "in a split second, it felt like my skull was being scraped." Johnson recalled screaming, and he stated that "[e]xcruciating doesn't even explain the pain."

With his arm braced against his head, Johnson testified that he was able to grab defendant's wrist, and he bent defendant's arm back. Johnson thought that defendant was still going to stab him, and he backed up, running down the stairs to his apartment. Snow called the police, who were there three to five minutes later.

Johnson testified that he had over 40 stitches in his head, as well as a tube to drain liquid

from the wound. Johnson had over a month of follow-up care, and had a permanent scar on the back of his head. Johnson testified that there was blood on the stairs, on the wall outside defendant's apartment, and inside Johnson's apartment; he also testified that he did not enter defendant's apartment on the night of the incident. On cross-examination, Johnson did not remember whether he had consumed alcohol or smoked any marijuana.

After Johnson and Snow testified, defendant complained outside the presence of the jury about the trial court's "abrupt and abrasive demeanor," which defendant said was distracting him during the trial. The court responded that it did not have an attitude toward defendant and said that it had allowed defendant to ask questions beyond the scope of redirect examination so that defendant could ask the questions he wished to ask. Defendant also asked if he could use discovery to impeach witnesses, and the court said that he could "use whatever you want to use if you use it in the proper fashion." Defendant also complained of having no evidence other than the discovery documents. Defendant asked the court if he could recall Snow and Johnson because he misinterpreted a statement earlier made by the court and did not believe that he had been able to effectively cross-examine them; the court denied his request. Defendant then asked for a continuance, which the court denied.

The State then called Chicago police officer Phillip Campbell as a witness. Officer Campbell testified that he was an evidence technician who had been called to the scene of the crime on August 10, 2006. He observed a blood trail on the stairs, along the wall in the hallway, and "literally all over" the front room of Johnson's apartment; he also observed blood in the hallway on the second floor and a stand just inside defendant's apartment door holding a bloody

knife. Officer Campbell testified that the door to defendant's apartment was open when he arrived. After observing the scene, Officer Campbell photographed it and recovered the knife, which he described as a "thirteen and a half inch knife with an eight and a half inch blade with blood on it." Officer Campbell testified that there was no blood inside defendant's apartment.

The State next called Tiffany Kimble, a forensic scientist with the Illinois State Police, who testified that she was unable to recover any suitable latent fingerprints from the knife.

The State then called Chicago police officer Derrick Cross, one of the responding officers to the incident. Officer Cross testified that he and his partners, Officer Borum and Officer Young, responded to a call of a stabbing on August 10, 2006. Officer Cross entered the apartment building and went to Johnson's apartment, where he observed Johnson bleeding from the head with a towel held to the back of his head; Officer Cross also testified that there was blood in the apartment.

Officer Cross went to defendant's apartment three to five minutes later, where Officers Borum and Young were with defendant; he did not observe any blood or injuries on defendant. Officer Cross observed blood on the wall opposite defendant's front door, as well as a knife with a "red stain" on a stand near the front door.

During a recess, outside the presence of the jury, defendant asked the court if he could question Officers Borum and Young concerning statements that Johnson and Snow had made on the night of the incident, claiming that there were inconsistencies in the police report. Defendant did not identify the inconsistencies; the officers were not present in court, and the State said that there was nothing in the report that could be used to impeach Johnson and Snow. The trial court

found that defendant had not established a foundation as to any impeachment, and defendant again stated that he was not receiving a fair trial. When the trial court brought the jury back, the State rested and the trial was continued to the next day.

The next day, defendant again complained that the trial was being held outside the presence of the public, which the court and the State both denied. Defendant then testified on his own behalf. Defendant testified that on the night of the incident, he was coming home from work and had brought a woman to his apartment; he did not know the woman's name but called her Shorty. They were in the apartment for less than five minutes when somebody knocked on the door. Defendant opened the door because he thought that his brother was at the door. When he saw that Johnson was at the door, defendant told Johnson to go back downstairs and tried to close the door; Johnson tried to stop defendant from closing the door. Defendant noted that Johnson was "pretty big." Defendant then told Johnson that he had company and to "holler at me later" and then tried to close the door again. Johnson prevented defendant from closing the door, and the two engaged in a "tussle."

Defendant testified that a knife was pulled, but that it was not the butcher knife recovered at the scene. He further testified that after the incident, the woman wanted to leave, and in order to ensure she left safely, defendant took a butcher knife from his kitchen and opened the door, watching that she left safely. While defendant was watching the woman leave, he phoned the police, telling them that he had been attacked. When police arrived, they asked whether anyone else was present, and defendant responded that "she just left." The police told him that if nobody else was present, "that's not going to be good for you."

Defendant described himself as "a very good person," stating that he was "very courteous, and very kind, and very considerate and appreciate when someone is very courteous, and kind, and considerate to me." He described Johnson as "[p]retty intimidating" and said that he was scared when Johnson came to the door. He testified that Johnson came into his apartment. When he pushed Johnson out of the apartment, defendant was "shocked," and didn't even realize that a stabbing had occurred. Defendant denied that the butcher knife had been used to stab Johnson, saying "[t]hat butcher knife would have killed him." He also denied that there was any blood on the butcher knife when he took it from the kitchen, but stated that once the police officers were in his apartment, they "started doing some things." He also testified that Johnson was drunk and had marijuana in his system.

Outside the presence of the jury, defendant sought to introduce medical records indicating that Johnson had alcohol and marijuana in his system at the time of the incident. The court told defendant that the document was not admissible without someone from the hospital laying a proper foundation. Defendant stated that he wished to bring medical personnel in to testify accordingly, and the court denied his request, finding that defendant had not been diligent. The State refused to stipulate to the presence of alcohol and marijuana.

Defendant also sought to introduce the 911 call that he made claiming to have been attacked. The State eventually agreed to stipulate that defendant made the 911 call approximately one minute after Snow phoned 911. After defendant rested, the court, the State, and defendant discussed the State's proposed jury instructions outside the presence of the jury. Defendant did not propose any jury instructions. Both the State and defendant gave closing arguments.

After closing arguments, the court instructed the jury as to the law, including an instruction pursuant to Illinois Pattern Jury Instruction, Criminal, No. 2.03 (Illinois Pattern Jury Instructions, Criminal, No. 2.03 (4th ed. 2000)):

> "The Defendant is presumed to be innocent of the charges
>
> against him. And this presumption remains with him throughout
>
> every stage of the trial and during your deliberations on the verdict,
>
> and is not overcome unless from all the evidence in this case you
>
> are convinced beyond a reasonable doubt that he is guilty.
>
> The State has the burden of proving the guilt of the
>
> Defendant beyond a reasonable doubt. And this burden remains on
>
> the State throughout the case. The Defendant is not required to
>
> prove his innocence."

After the jury had deliberated for 27 minutes, they returned with a verdict, finding defendant guilty of attempted first degree murder and aggravated battery. On January 20, 2009, defendant came before the court for posttrial motions. Defendant made an oral motion for a new trial, in which defendant raised a number of issues he had with the court, the prosecutors, and the jury. The trial court denied the motion, saying in part, "You were told the consequences of going pro se, early on. We went through lawyers upon lawyers upon lawyers after that. *** None of whom satisfied you. As to what you wanted them to do. So, it was your choice."

Defendant appeared before the court on January 23, 2009, for sentencing. Defendant appeared *pro se*, and did not request an attorney for the sentencing hearing; the court did not

inquire into whether defendant wished to be represented by counsel. Defendant asked the court to strike a number of items in his presentence report, and the trial court agreed. The State argued that there were aggravating circumstances present, including defendant's disruptive behavior in court. In mitigation, defendant raised the same arguments of bias, and asked the court to "remember that you are doing it to an innocent man." In sentencing defendant, the court listed the different courtrooms and different attorneys that had been involved in the case, noted that defendant had been convicted by a jury selected from the community, and considered defendant's presentence report containing four prior felony convictions and defendant's statement that he was innocent; the court noted that "I am not considering at all your outrageous allegations about racism, how unfair this court is whatsoever." The court vacated the convictions of aggravated battery because they were "the lesser charges to the charge of attempted murder" and sentenced defendant to 25 years' imprisonment for the attempted murder charge, followed by 5 months' imprisonment for the contempt charge. The court also appointed the State Appellate Defender to represent defendant on appeal.

## ANALYSIS

On appeal, defendant raises three[5] issues: (1) that the trial court denied defendant his constitutional right to counsel by failing to admonish him at the start of trial pursuant to Supreme

---

[5] Defendant initially raised four issues on appeal, including an argument that the trial court erred in failing to examine his pretrial claims of ineffective assistance of counsel. However, while this case was pending, the Illinois Supreme Court issued its decision in *People v. Jocko*, No. 108465 (Ill. Nov. 18, 2010), and defendant no longer appeals on that basis.

No. 1-09-0338

Court Rule 401(a) (Ill. S. Ct. R. 401 (eff. July 1, 1984)) prior to allowing him to proceed *pro se*; (2) that the trial court erred in denying defendant standby counsel; and (3) that the trial court violated Supreme Court Rule 431(b) during jury selection by not properly inquiring into all of the *Zehr* factors. We consider each of defendant's arguments in turn.

Rule 401(a)

Defendant's first argument is that his constitutional right to counsel was violated because the trial court failed to admonish defendant pursuant to Rule 401(a) before requiring him to proceed *pro* se at the time of trial. The sixth amendment to the United States Constitution (U.S. Const., amend. VI) guarantees an accused in a criminal proceeding the right to the assistance of counsel. *People v. Jiles*, 364 Ill. App. 3d 320, 328 (2006). Any waiver of that right must be voluntary, knowing, and intelligent. *Jiles*, 364 Ill. App. 3d at 328 (citing *People v. Haynes*, 174 Ill. 2d 204, 235 (1996)).

A defendant's waiver of the right to counsel must be clear and unequivocal. *People v. Mayo*, 198 Ill. 2d 530, 538 (2002); *People v. Burton*, 184 Ill. 2d 1, 21 (1998). The purpose of requiring a clear and unequivocal waiver is to "(1) prevent the defendant from appealing [either] the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating and abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *Mayo*, 198 Ill. 2d at 538. To determine whether defendant's waiver was clear and unequivocal, a court will look to " 'the overall context of the proceedings,' " including " 'the defendant's conduct following the defendant's request to represent himself.' " *Mayo*, 198 Ill. 2d at 538-39 (quoting *Burton*, 184 Ill. 2d at 22, 23-24).

39

Before a trial court can find that a defendant has waived his right to counsel, the court must provide the three admonishments listed in Rule 401(a) to the defendant:

"(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401 (eff. July 1, 1984).

Rule 401(a) helps ensure that a defendant's waiver is knowing and voluntary, and our supreme court has held that "compliance with Rule 401(a) is required for an effective waiver of counsel." *Haynes*, 174 Ill. 2d at 236 (citing *People v. Baker*, 94 Ill. 2d 129, 137 (1983)). However, strict compliance with Rule 401(a) is not required and "substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly

and voluntarily, and the admonishment the defendant received did not prejudice his rights."
*Haynes*, 174 Ill. 2d at 236 (citing *People v. Coleman*, 129 Ill. 2d 321, 333 (1989)).

Defendant admits that he was properly admonished by the trial court several times throughout the course of the proceedings.[6]  However, he claims that the trial court was required to readmonish defendant after Dosch was granted leave to withdraw on October 30, 2008.  Since this issue requires us to determine whether the trial court has complied with a supreme court rule, we review it *de novo*.  *People v. Campbell*, 224 Ill. 2d 80, 84 (2006); *People v. Polk*, 349 Ill. App. 3d 760, 763-64 (2004).

There is no claim from either party that the trial court strictly complied with Rule 401(a) on October 30, 2008.  Thus, in order to find the court's actions proper, either there must have been substantial compliance with Rule 401(a) or the court must not have been required to readmonish defendant at that time.  We are not aware of, and the parties did not provide, any case or authority considering the precise issue before us: a trial court's responsibility under Rule 401(a) when  a defendant has, during a single stage of the proceedings, engaged in a pattern of (1) being represented by counsel, (2) rejecting such counsel and proceeding *pro se*, and (3) requesting

---

[6] The State claims that defendant was admonished four times, while defendant argues that he was only admonished twice.  The admonishments by Judge Salone on February 23, 2007, and April 2, 2007, were partial admonishments and did not strictly comply with Rule 401(a); whether they substantially complied with Rule 401(a) is not at issue here.  Nevertheless, defendant does acknowledge the Rule 401(a) admonishments by Judge Sacks on October 29, 2007, and January 25, 2008, were in substantial compliance with the rule.

counsel again and again proceeding *pro se*.[7]   Under the unique circumstances of the case before us, we cannot find that defendant is entitled to a new trial.

Defendant claims that he was required to receive additional admonishments on October 30, 2008.  In support of his argument, defendant cites the "continuing waiver" rule.  Under the continuing waiver rule, a valid waiver of counsel generally continues throughout later stages of the proceedings, including posttrial stages.  *People v. Baker*, 92 Ill. 2d 85, 91-92 (1982).  The continuing waiver rule, however, is subject to two exceptions: " '(1) the defendant later requests counsel or (2) other circumstances suggest that the waiver is limited to a particular stage of the proceedings.' " *People v. Cleveland*, 393 Ill. App. 3d 700, 705 (2009) (quoting *People v. Palmer*, 382 Ill. App. 3d 1151, 1162 (2008)).  Circumstances requiring readmonishment include lengthy delays between trial stages, newly discovered evidence, new charges, or a request from the defendant.  *People v. Simpson*, 172 Ill. 2d 117, 138 (1996) (citing *Baker*, 92 Ill. 2d at 93-94).  Therefore, a valid waiver may end when a defendant requests counsel at a later time or demonstrates through his conduct that he only wishes to proceed *pro se* for the current stage of proceedings.  Defendant argues that "[i]t is well-settled that" by requesting, and being represented by, counsel, any prior waiver was rescinded and a later waiver of counsel required new admonishments under Rule 401(a).

However, the result is not as clear-cut as defendant claims.  The continuing waiver rule

---

[7] We note that defendant has only argued that he needed to be admonished on October 30, 2008.  He does not raise any issues on appeal concerning denial of counsel at the trial or posttrial stages and so we do not consider them here.

addresses the need for admonishments at a separate stage of the proceedings from the initial waiver of counsel. See, *e.g.*, *Simpson*, 172 Ill. 2d at 137-38 (analyzing whether the defendant needed to be readmonished prior to sentencing when he had represented himself during pretrial and trial stages). It has not been used to address the situation where, as here, the defendant waives counsel a number of times during the same stage. Thus, we must determine, from the facts of this case, whether defendant was required to be readmonished and, if so, whether the trial court substantially complied with Rule 401(a).

In order to fully comprehend the context of any waiver, an overview of the pretrial proceedings is helpful. Defendant was officially represented by four different attorneys from the public defender's office throughout the two years leading up to trial. He was dissatisfied with all, and two were reappointed and again discharged. Defendant was offered four private attorneys whom he did not desire to retain to represent him. During that time, defendant proceeded *pro se* on approximately seven different occasions, also claiming dissatisfaction with all attorneys with whom he came into contact. Defendant was admonished by Judge Salone on February 23, 2007, including being informed of the nature of the charges and the possible sentence range. He was admonished again on April 2, 2007, and informed of the minimum and maximum possible sentences for his offenses. Defendant was admonished by Judge Sacks twice, on October 29, 2007, after "fir[ing]" APD Gallagher, and on January 25, 2008, after refusing to be represented by APD Davis. After "fir[ing]" Davis for a second time on February 15, 2008, defendant proceeded *pro se* while attempting to retain private counsel. During that period, defendant was offered representation by private attorneys Kloak, Dosch, and Weiner by the trial court, and was allowed

to speak with Johnson, a private attorney selected by defendant. All of these attorneys were rejected by defendant, generally because they refused to cooperate with defendant's demands. Basically, defendant did not want to be involved with the BCX examination, and when attorneys requested them, that alone caused him to be dissatisfied with those attorneys who requested them. Once the case was finally set for trial, defendant eventually selected Dosch to represent him "[f]or now" before " 'totally and completely fir[ing]' " him, leading to Dosch's withdrawal from the case on October 30, 2008.

In arguing that readmonishment was necessary, defendant heavily relies on our decision in *People v. Cleveland*, 393 Ill. App. 3d 700 (2009), while the State points to the Illinois Supreme Court decision of *People v. Johnson*, 119 Ill. 2d 119 (1987), in support of its argument. While neither of these cases is entirely on point, both are instructive.

In *Johnson*, our supreme court considered whether the defendant had been properly admonished under Rule 401(a). The defendant in that case had private counsel, who filed a motion for leave to withdraw because the defendant was unable to pay his legal fees; the trial court then appointed an assistant public defender to represent the defendant. *Johnson*, 119 Ill. 2d at 124. On the day that his trial was scheduled to begin, the defendant informed the court that he no longer wished to be represented by the assistant public defender and filed a *pro se* motion asking for the appointment of " 'other counsel from outside of the Public Defender's office and from outside of Will County' "; the trial court denied the defendant's motion. *Johnson*, 119 Ill. 2d at 124.

A few days later, the defendant informed the court that he refused to be represented by the

assistant public defender, he would not represent himself, and he would absent himself from the proceedings. *Johnson*, 119 Ill. 2d at 125. However, the defendant appeared in court on the date scheduled for jury selection. The trial court admonished him pursuant to Rule 401(a) because it was not clear whether the defendant intended to proceed *pro se*. *Johnson*, 119 Ill. 2d at 125-27. After speaking with the defendant, the assistant public defenders assigned to the case advised the trial court that they would continue to represent the defendant; however, when the trial court asked the defendant, he stated that he was not accepting them as counsel. When the trial court asked the defendant whether he was proceeding *pro se*, the defendant responded that he and the public defenders were " 'trying to get an understanding.' " *Johnson*, 119 Ill. 2d at 127.

After a continuance, the assistant public defender advised the trial court that the defendant refused to speak with them. *Johnson*, 119 Ill. 2d at 128. The trial court then advised the defendant that he would be required to proceed *pro se*, but that the assistant public defenders would be appointed as standby counsel. *Johnson*, 119 Ill. 2d at 128. At his next court appearance, the defendant advised the trial court that he wanted to be represented by the assistant public defenders and the court reappointed them. *Johnson*, 119 Ill. 2d at 128. Later, the defendant advised the court that he did not agree with a stipulation that his attorneys intended to enter into with the State and did not desire to be represented by them. *Johnson*, 119 Ill. 2d at 129. He further advised the court that he would not be present for trial and the court reappointed the assistant public defenders as standby counsel. *Johnson*, 119 Ill. 2d at 129. At his next court date, the trial court admonished the defendant pursuant to Rule 401(a), but did not inform the defendant that the minimum sentence for his crime was life imprisonment. *Johnson*, 119 Ill. 2d at

129.

On appeal, the defendant argued that he had not knowingly and intelligently waived his right to counsel because he had not been properly admonished under Rule 401(a). *Johnson*, 119 Ill. 2d at 130. Our supreme court held that the defendant had been properly admonished. *Johnson*, 119 Ill. 2d at 131. The court held that "where, as here, a review of the entire record indicates that defendant's waiver of his right to counsel was made knowingly and voluntarily, and the sole admonishment which he did not receive in no sense prejudiced defendant's rights, substantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel." *Johnson*, 119 Ill. 2d at 132.

Significantly, when considering whether Johnson had been properly admonished, the court did not solely focus on the admonishments given at the time that the defendant waived counsel for the final time. Instead, the court looked at the previous admonishments and pointed to facts throughout the record to support the conclusion that the defendant had been properly admonished. For instance, when finding that the defendant had been informed of the nature of the charges, the court quoted from the admonishments given the first time that the defendant had waived counsel, noted that the defendant had indicated that he was familiar with the indictment, and pointed out that the defendant had represented that his original counsel had informed him of the nature of the charges. *Johnson*, 119 Ill. 2d at 131. The court also noted that "[a]lthough the trial court did not advise defendant that life imprisonment was the minimum penalty to which he would be subjected in the event he was convicted of the charges, the record reveals that he was aware of this penalty." *Johnson*, 119 Ill. 2d at 132.

46

In its analysis, the court noted that the defendant did not claim that he was unaware of the potential penalties and had represented that his original attorney informed him of them. *Johnson*, 119 Ill. 2d at 133. The court also pointed out that the defendant was "no stranger to criminal proceedings," having previously been tried and convicted for a number of crimes. *Johnson*, 119 Ill. 2d at 133. Finally, the court found that the defendant had not suffered any prejudice from the trial court's failure to inform him of his minimum sentence, and there was no indication that his decision to waive counsel would have been different had he been specifically admonished regarding the minimum sentence. *Johnson*, 119 Ill. 2d at 134.

After considering the above factors, the court concluded that "[i]t is our view, based on the record, that the trial court did what it could to accommodate defendant during the entire course of the proceedings. Defendant, on the other hand, engaged in conduct designed to impede and delay those proceedings." *Johnson*, 119 Ill. 2d at 134. The court recognized the importance of a defendant's right to counsel, but could not condone the "use of that right in a manner which appears calculated to 'thwart the administration of justice or to otherwise embarrass the effective prosecution of crime.' " *Johnson*, 119 Ill. 2d at 135 (quoting *People v. Myles*, 86 Ill. 2d 260, 268 (1981)). The court pointed out that "a defendant should not be permitted to frustrate the trial court's efforts to conduct an orderly, fair and expedient trial, and then benefit from an alleged error by the court which he invited through his own conduct." *Johnson*, 119 Ill. 2d at 135.

The State argues that the conduct exhibited in *Johnson* "paled in comparison" to defendant's conduct in the case at bar, and under the circumstances here, the admonishments given to defendant were sufficient. Defendant, on the other hand, argues that while the court in

*Johnson* may have substantially complied with Rule 401(a), the trial court in this case did not.

Defendant claims that, instead of analogizing his case to *Johnson*, we should reach the same result as we did in *Cleveland*, where the defendant waived his right to counsel during pretrial proceedings and was properly admonished according to Rule 401(a). *Cleveland*, 393 Ill. App. 3d at 702. After the defendant was tried and convicted, he requested the assistance of counsel for posttrial motions and sentencing; the trial court appointed an assistant public defender to represent the defendant. *Cleveland*, 393 Ill. App. 3d at 703. On the date that the posttrial motions were to be heard, the defendant once again waived counsel, and the trial court allowed him to proceed *pro se* without making any admonishments. *Cleveland*, 393 Ill. App. 3d at 703. The defendant also appeared *pro se* during his sentencing hearing, and the trial court did not inquire into the defendant's desire to continue without representation. *Cleveland*, 393 Ill. App. 3d at 703.

On appeal, the defendant claimed that he did not make a valid waiver of counsel at his sentencing hearing because he was not properly admonished. *Cleveland*, 393 Ill. App. 3d at 705. In *Cleveland*, we framed the issue as a situation "where defendant makes a valid waiver of counsel, requests counsel for a separate stage of the case, is granted the request, and then waives counsel a second time." *Cleveland*, 393 Ill. App. 3d at 706. We noted that there was no case precisely on point, but drew comparisons to existing case law and the particular facts of that case and concluded that when the defendant waived counsel for the second time, the trial court was required to substantially comply with Rule 401(a). *Cleveland*, 393 Ill. App. 3d at 708-09. We found that, while the court had implicitly informed the defendant that he had the right to counsel,

the court's failure to address the other two admonishments at different stages of the proceedings did not constitute substantial compliance. *Cleveland*, 393 Ill. App. 3d at 709-10. Additionally, we found that the defendant had been prejudiced by the absence of counsel at his sentencing hearing because his "lack of legal assistance and his own ineffective advocacy during this stage of the proceedings may have contributed to the length of his sentence." *Cleveland*, 393 Ill. App. 3d at 711.

Defendant argues that the case at bar is similar to *Cleveland* in that in both cases, the defendant proceeded *pro se*, was later appointed counsel, and then proceeded without counsel again. However, defendant reads our holding in *Cleveland* too broadly. Although defendant correctly notes that we focused on the fact that the *Cleveland* defendant was appointed counsel before again deciding to proceed *pro se*, the defendant in that case received counsel and waived it in a separate stage of the proceedings from his initial waiver of counsel. See *Cleveland*, 393 Ill. App. 3d at 702-03. Indeed, in our summary of our holding, we noted that there would only be a small burden on a trial court because "[o]nly in situations where a defendant waives counsel, proceeds *pro se*, *requests counsel for a distinct stage of the proceedings*, receives counsel, and then decides to waive counsel *again* will the trial court be required to take on even this minimal additional task." (Emphasis added and in original.) *Cleveland*, 393 Ill. App. 3d at 712. Thus, the question of whether defendant should have been readmonished is not as clear as simply applying the holding from *Cleveland* when the stage of the proceedings has not changed.

We find the situation in the case at bar to be more similar to *Johnson* than *Cleveland*. While in *Johnson* the question was whether the defendant had been properly admonished where

the court omitted one admonishment, both of the admonishments that the defendant received occurred during the same stage of the proceedings. See *Johnson*, 119 Ill. 2d at 125-27, 129. In determining whether the defendant had been properly admonished, the court did not solely focus on the later admonishments, but on the record as a whole. See *Johnson*, 119 Ill. 2d at 131-34.

Likewise, in our decision in *People v. Phillips*, 392 Ill. App. 3d 243 (2009), one of the factors in determining that there had been substantial compliance was the fact that the defendant in that case was admonished both at an earlier date and again a month after the waiver in question. While the defendant in that case decided not to waive counsel after the first admonishment, we nevertheless considered that admonishment in finding substantial compliance. See *Phillips*, 392 Ill. App. 3d at 263.

In the case at bar, when we consider the record as a whole, we find that defendant was properly admonished under Rule 401(a). First, defendant admits that he was properly admonished by Judge Sacks when he earlier proceeded *pro se*, and those admonishments contained all of the required information. Additionally, it is clear that defendant was amply aware of the information contained in the admonishments. After being represented by a number of attorneys, defendant was clearly aware of his right to counsel, and he referenced that right a number of times when addressing the court. Further, defendant knew the nature of the charges that he faced and the possible penalties. The Chicago Tribune article he read to the trial court on the same day that Dosch withdrew referenced the attempted murder charge, and the trial court reminded him of the charges on the next court date. All of the admonishments he received, including the two partial admonishments from Judge Salone, included the sentence; thus, he was advised of this

information no less than four times.

Moreover, we cannot find that defendant was prejudiced by any flaw in the admonishments. Although defendant claims that he was prejudiced because he did not tender additional jury instructions concerning self-defense and was unable to introduce medical records into evidence, we find this argument unpersuasive. There is absolutely no indication in the record that, had defendant been fully admonished on October 30, 2008, his actions would have been any different. In fact, defendant had been admonished a number of times throughout the pretrial proceedings, and those admonitions did not change defendant's decision to repeatedly reject his appointed counsel. Additionally, there was no evidence of self-defense and there is no showing that self-defense jury instructions would have been allowed. Further, there is no showing that any further admonishment would have changed defendant's trial strategy or provided defendant with the ability to introduce the medical records into evidence.

Finally, we must take into consideration defendant's conduct as a whole. Like the trial court in *Johnson*, we find that the trial court here "did what it could to accommodate defendant during the entire course of the proceedings." *Johnson*, 119 Ill. 2d at 134. Defendant continually found fault with his attorneys, while insisting that he did not wish to represent himself. The court gave defendant a number of continuances in order for him to hire an attorney, and when defendant was unable to find an attorney of his liking, the trial court provided defendant with three private attorneys that the court was willing to appoint; in fact, when defendant did suggest an additional private attorney, Robert Johnson, the trial court indicated that if defendant wished to be represented by Johnson, the court would appoint him. The court did this despite defendant's

constant tirades and insults to the trial judge, the prosecutors, and the defense attorneys. "[A] defendant should not be permitted to frustrate the trial court's efforts to conduct an orderly, fair and expedient trial, and then benefit from an alleged error by the court which he invited through his own conduct." *Johnson*, 119 Ill. 2d at 135. We find that defendant under the circumstances of this case was properly admonished according to Rule 401(a).

Refusal to Appoint Standby Counsel

Defendant's second argument on appeal is that the trial court erred in denying him standby counsel because the court denied it based on a "blanket policy" of not appointing standby counsel once a defendant decided to proceed *pro se*. Whether the trial court erred in refusing to appoint standby counsel is reviewed under an abuse of discretion standard. *People v. Gibson*, 136 Ill. 2d 362, 379 (1990). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)).

A *pro se* defendant does not have a right to standby counsel, but since there is no state statute or court rule to the contrary, such appointment is permissible. *Gibson*, 136 Ill. 2d at 383; *McKaskle v. Wiggins*, 465 U.S. 168, 170 (1984). If the trial court appoints standby counsel, it retains broad discretion to determine the scope of standby counsel's involvement. *People v. Redd*, 173 Ill. 2d 1, 38 (1996); *People v. Smith*, 249 Ill. App. 3d 460, 470-71 (1993). However, a *pro se* defendant maintains the right to control the case presented and standby counsel's participation should not be allowed to destroy the perception that defendant is representing

himself. *Gibson*, 136 Ill. 2d at 376; *McKaskle*, 465 U.S. at 178. "Thus, standby counsel may assist a *pro se* defendant 'in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete,' and may also help 'ensure the defendant's compliance with basic rules of courtroom protocol and procedure.' " *Gibson*, 136 Ill. 2d at 378 (quoting *McKaskle*, 465 U.S. at 183).

In *People v. Queen*, 56 Ill. 2d 560, 565 (1974), the Illinois Supreme Court found that a trial court commits error when it "refuses to exercise discretion in the erroneous belief that it has no discretion as to the question presented." The defendant in *Gibson* argued, based on this finding in *Queen*, that the trial court's failure to exercise discretion required automatic reversal for a new trial. *Gibson*, 136 Ill. 2d at 379-80. Our supreme court interpreted *Queen* to suggest that such a failure to exercise discretion had to be assessed in the context of the entire proceeding. *Gibson*, 136 Ill. 2d at 379-80. The defendant has the burden to prove that prejudice resulted from the trial court's failure to exercise its discretion. *People v. Chapman*, 194 Ill. 2d 186, 223 (2000).

In *Gibson*, our supreme court found that the trial court's decision to deny the defendant's request for standby counsel was an abuse of discretion that required a new trial. *Gibson*, 136 Ill. 2d at 379-80. In its analysis, the court stated that "[r]elevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Gibson*, 136 Ill. 2d at 380. The court did not consider the defendant's argument that the trial court's failure to

exercise its discretion required automatic reversal, but noted that the utility of such a rule was "doubtful," since, "[f]or example, if it could be determined that the refusal to appoint standby counsel would not have been an abuse of discretion, there would be no purpose now in remanding the cause for further proceedings solely on the ground that the trial judge failed to exercise his discretion." *Gibson*, 136 Ill. 2d at 380.

In this case, the State initially argues that defendant has forfeited this issue by failing to raise it in his posttrial motion. Defendant admits that he did not raise the issue in his posttrial motion but argues that we should not consider the issue waived; alternatively, if we find the issue waived, defendant urges us to review the claim under the plain error doctrine. In order to preserve the issue for appeal, defendant was required to raise the issue by objecting at trial and in a posttrial motion. *People v. Martinez*, 242 Ill. App. 3d 915, 925 (1992). Defendant has failed to do so and therefore has forfeited his right to this claim. *People v. Daniels*, 331 Ill. App. 3d 380, 389 (2002). Thus, we review the claim under the plain error doctrine.

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Before we reach the issue of plain error, we must first determine whether any error occurred at all. *People v. Walker*, 392 Ill. App. 3d 277, 294 (2009) ("[i]n a plain error analysis, 'the first step' for a

reviewing court is to determine whether any error at all occurred"). In the case at bar, we do not find any error.

Defendant argues that the trial court did not consider the *Gibson* factors in denying defendant the assistance of standby counsel. The first time that the trial court admonished defendant pursuant to Rule 401(a), the admonishment concluded with a statement that

"the court *** will not appoint standby counsel to assist you during the course of trial. *** In other words, Mr. Ware, if you decide to go pro se, you go pro se. There will not be an attorney sitting there to advise you. There will not be a combination of having a lawyer and going pro se at the same time. If you want to go pro se, which is your right to do that, there will not be a lawyer to assist you."

The second time that defendant was admonished, defendant specifically challenged the court's statement that he could not receive assistance from standby counsel:

"THE COURT: [I]f the court in its discretion is not going to appoint stand-by counsel, which I will not, that I informed you that there would be no stand-by counsel to assist you during the course of the trial.

Do you understand that?

DEFENDANT: I don't understand why.

THE COURT: Did you understand what I said?

DEFENDANT: I understand what you say, but I still don't

understand why.

THE COURT: Because if a man wants to go pro se, he goes pro se. If he wants a lawyer, he has a lawyer, not a combination of both.

If you want a lawyer, you can get one or stay with Ms. Davis; or if you want to go pro se, you can go pro se. I will not appoint the lawyer to stand by and act as stand-by counsel for you."

When explaining to defendant why it would not appoint standby counsel, the court did not refer to anything in defendant's case specifically indicating that standby counsel was not required, but instead stated that in the trial court's discretion he was not going to appoint standby counsel. We cannot say that this indicates that the court's decision was a blanket policy and not based on a consideration of the *Gibson* factors.

However, if we agree with defendant that the trial court failed to exercise its discretion, we cannot find that defendant was prejudiced because, even if the trial court had exercised its discretion and denied defendant standby counsel, that decision would not have been an abuse of discretion. In our analysis, we consider the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of defendant. *Gibson*, 136 Ill. 2d at 380.

First, the charges in this case included attempted first degree murder and aggravated battery. The charges were serious, resulting in a sentence of 25 years' imprisonment on the attempted murder charge. However, the facts and law involved with the charges were not

complex; defendant was accused of stabbing the victim in the head with a butcher knife. Defendant did not refute the act of stabbing the victim in the head, but argued that he was acting in self-defense. While raising an affirmative defense increased the complexity of the case somewhat, it was still a fairly simple issue. Additionally, the evidence in the case consisted primarily of testimony from the victim, his wife, police officers, and defendant; there were no expert witnesses nor was there scientific evidence. See *Phillips*, 392 Ill. App. 3d at 265 (noting the lack of expert testimony and scientific evidence in finding that facts and law were not complex). There was photographic evidence of the crime scene and the knife recovered from defendant's apartment, but there was no question as to the authenticity of this evidence, other than defendant cross-examining a police officer about the lighting in the photographs. Finally, defendant was over 40 years old and was no stranger to criminal proceedings. See, *e.g.*, *Phillips*, 392 Ill. App. 3d at 265 (finding that standby counsel was not required and noting that the defendant was 41 years old and no stranger to criminal proceedings).

Defendant argues that standby counsel should have been appointed. He claims that because he did not have standby counsel, he was unable to subpoena a witness to provide a foundation for the introduction Johnson's medical records and that standby counsel would have ensured that defendant tendered additional jury instructions concerning self-defense. Defendant also argues that he had only an eighth-grade education and had never faced such serious charges or represented himself in prior cases. Thus, he claims that the *Gibson* factors indicate that standby counsel should have been appointed.

However, despite defendant's arguments, we cannot find that the trial court would have

abused its discretion in denying defendant standby counsel. The trial court had the opportunity to observe defendant throughout the lengthy pretrial proceedings and at times told defendant that he was doing a good job representing himself. Defendant also cross-examined witnesses, provided an opening and closing statement, and participated in jury selection, as well as indicating a familiarity with legal concepts through his interactions with the court. Further, defendant testified on his own behalf and told his side of the story.

As a final matter, the evidence in the case was overwhelming. There was no question that defendant stabbed Johnson in the head, a bloody knife was found inside defendant's apartment, and there was blood in the hallway outside defendant's door; there was, however, no blood found inside defendant's apartment other than the blood on the knife. The presence of standby counsel likely would not have made any difference in defendant's ability to defend his case. Defendant had no marks or bruises on his person. There was no evidence that the victim had a weapon or injured defendant. There is no showing that additional jury instructions for self defense would have been allowed, or that the medical records of the victim would have made a difference. Thus, after balancing the relevant factors, we cannot find that the trial court abused its discretion in denying defendant standby counsel, and accordingly, "there would be no purpose now in remanding the cause for further proceedings solely on the ground that the trial judge failed to exercise his discretion." *Gibson*, 136 Ill. 2d at 380.

Rule 431(b)

Defendant finally argues that the trial court violated Rule 431(b) by failing to properly inquire into all of the *Zehr* factors during jury selection. Although supreme court rules are not

statutes, they have " 'the force of law, and the presumption must be that they will be obeyed and enforced as written.' " *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332 (2002) (quoting *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995)). Issues concerning the interpretation of a supreme court rule are reviewed *de novo*. *People v. Reed*, 376 Ill. App. 3d 121, 125 (2007).

Illinois Supreme Court Rule 431(b) is a codification of our supreme court's holding in *People v. Zehr*, 103 Ill. 2d at 477. In *Zehr*, our supreme court held that it is "essential to the qualification of jurors in a criminal case *** that they know" and accept four fundamental principles: (1) that defendant is presumed innocent; (2) that defendant is not required to produce any evidence on his own; (3) that defendant must be proven guilty beyond a reasonable doubt; and (4) that defendant's failure to testify on his own behalf cannot be held against him. *Zehr*, 103 Ill. 2d at 477. These four principles are commonly known as the four "*Zehr* principles." *People v. Hammonds*, 399 Ill. App. 3d 927, 946 (2010); *People v. Martinez*, 386 Ill. App. 3d 153, 158 (2008); *People v. Gilbert*, 379 Ill. App. 3d 106, 109 (2008).

Currently, Supreme Court Rule 431(b) provides:

"(b) The court shall ask each potential juror, individually or

in a group, whether that juror understands and accepts the

following principles: (1) that the defendant is presumed innocent of

the charge(s) against him or her; (2) that before a defendant can be

convicted the State must prove the defendant guilty beyond a

reasonable doubt; (3) that the defendant is not required to offer any

evidence on his or her own behalf; and (4) that the defendant's

failure to testify cannot be held against him or her; however, no

inquiry of a prospective juror shall be made into the defendant's

failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an

opportunity to respond to specific questions concerning the

principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1,

2007).

To ensure compliance with its 1984 *Zehr* decision, our supreme court amended Rule 431 twice, with the first amendment in 1997 and the second in 2007. Under the 1997 version, the rule began with the phrase, "[i]f requested by the defendant." Ill. S. Ct. R. 431(b) (eff. May 1, 1997). According to the committee notes, the 1997 amendment sought to "end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997). The 1997 rule did not place the trial court under an obligation to question potential jurors regarding the *Zehr* principles unless the defendant made a request. *People v. Graham*, 393 Ill. App. 3d 268, 272 (2009). Once the supreme court amended the rule in 2007, the trial court was required to ask about the *Zehr* principles regardless of whether there was a request by the defense. Both parties in the case at bar agree that the 2007 version of the rule was in force at the time of defendant's trial.

Defendant argues that the trial court violated Rule 431(b) "because the trial court: (1) combined the second and three [*sic*] principles into a singular one; (2) combined the third and

fourth principles into a singular one; (3) mangled the fourth principle by stating the jurors were to 'draw no inference in favor of Mr. Ware or against Mr. Ware' for failing to testify; and (4) only asked the jurors if 'anyone [has] any difficulty' with the various principles." The parties agree that defendant did not preserve the issue for review by failing to object at trial and in his posttrial motion. Thus, we review defendant's claim under the plain error doctrine.

As we noted, "the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. Before we reach the issue of plain error, we must first determine whether any error occurred at all. *Walker*, 392 Ill. App. 3d at 294 ("[i]n a plain error analysis, 'the first step' for a reviewing court is to determine whether any error at all occurred"). In the case at bar, we find no error.

During *voir dire*, the trial court addressed the venire as a whole. When the venire were brought into the courtroom, the court explained to them about jury service generally, about the charges brought against defendant, and about their responsibilities as venirepeople. During its explanation, the court stated:

"Under the law, the Defendant is innocent of the charges

against him, and that presumption remains [with] him throughout

every stage of the trial and during your deliberations and is not

overcome unless you are all convinced beyond a reasonable doubt that he is guilty. The State, in this case Ms. Gambino [and] Ms. Rosen, has the burden of proving this case beyond a reasonable doubt, and that stays on the State. The Defendant is not required to prove the charges against him. He is not required to call witnesses or testify on his [own] behalf. He may rely upon the presumption of innocence."

Later, the trial court continued:

"There are certain principles that apply in a criminal case, and, of course, apply to the case of People versus Maurice Ware. One of those principles is that the Defendant, Maurice Ware, has the presumption of innocence with him, and that remains with him and is not overcome unless by your verdict that the State has proven him guilty beyond a reasonable doubt. Does anybody have any difficulty with the principle that an accused person is innocent of the charges against them? No response.

In conjunction with that is the additional one, that the State, Ms. Gambino and Ms. Rosen in this case, has the burden of proof beyond a reasonable doubt, and that burden stays on the State throughout the entire trial. The Defendant is not required to prove that he is innocent of the charges against him. Does anyone have

62

any difficulty with the principle that the State must prove guilt beyond a reasonable doubt, that the Defendant must prove nothing to you? Again, no response.

In conjunction with those two principles is the additional one that the Defendant, Mr. Maurice Ware, has the absolute right to remain silent, and he may sit here and not testify and rely on his presumption of innocence. If that were to occur, you are to draw no inference either in favor of Mr. Ware or against Mr. Ware because he chooses to remain silent. Does anyone have any difficulty with the principle that an accused person has the absolute right to remain silent and not testify? Again, no response.

If at the close of all the evidence in the case, the arguments by the lawyers, instructions by me, you come to the conclusion that the State has proven guilt beyond a reasonable doubt, under those circumstances, does anybody have any problem signing a verdict form in this case that would say guilty? No response.

The other side of the coin applies equally as well. At the end of all the evidence in the case, the arguments by the lawyers, instructions by me, you come to the conclusion that the State has not proven guilt beyond a reasonable doubt, under those circumstances, does anyone have any problem signing a verdict

form which would say not guilty?  Again, no response."

We cannot find that the trial court violated Rule 431(b) in its questioning.  The court explicitly mentioned all four principles, despite defendant's argument that the trial court combined several principles and "mangled" the principle that a defendant's failure to testify cannot be held against him.  The fact that one principle was explained at the same time as another does not invalidate the court's statement of those principles.  See, *e.g.*, *People v. McCovins*, 399 Ill. App. 3d 323, 327 (2010); *People v. Davis*, No. 1-08-2895, slip op. at 4-5 (Ill. App. Nov. 12, 2010).  The core of defendant's argument for a *Zehr* violation, however, is that the court failed to inquire whether each juror understood and accepted each of the principles.  Instead, the court ended his statement of the principles by asking the jury whether "anybody ha[d] any difficulty" with each of the principles.  We find no error because we do not believe there is special magic language that needs to be used to show whether a prospective juror understands and accepts the four *Zehr* principles.  See *McCovins*, 399 Ill. App. 3d at 327; *People v. Vargas*, 396 Ill. App. 3d 465, 472 (2009) (noting that Rule 431(b) does not provide for any "magic words" or "catechism" to satisfy its mandate).  The language used by the trial court encompasses both understanding and acceptance; an individual who did not understand the principle or did not accept the principle would "have *** difficulty" with the principle.

Moreover, the court also made it very simple for the venire to respond to each question that it asked.  The court explained the principles and paused every few sentences to ask, "Does anybody have any difficulty with the principle" that was being explained.  By questioning the venire every few sentences, the trial court ensured that the jurors would be able to focus on each

principle explained instead of making "a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." Ill. S. Ct. R. 431, Committee Comments (eff. May 1, 1997). This questioning was sufficient to give the jurors the opportunity to disagree with any of the principles. See *People v. Wilmington*, 394 Ill. App. 3d 567, 576 (2009) (noting that Rule 431(b) requires all four admonishments and "an opportunity to disagree with each of the four principles").

Additionally, the trial court repeated the *Zehr* principles in its jury instructions. The court instructed the jurors:

> "The Defendant is presumed to be innocent of the charges
>
> against him. And this presumption remains with him throughout
>
> every stage of the trial and during your deliberations on the verdict,
>
> and is not overcome unless from all the evidence in this case you
>
> are convinced beyond a reasonable doubt that he is guilty.
>
> The State has the burden of proving the guilt of the
>
> Defendant beyond a reasonable doubt. And this burden remains on
>
> the State throughout the case. The Defendant is not required to
>
> prove his innocence."

These jury instructions served to reinforce the principles that the trial court questioned the jurors about at the beginning of trial.

Finally, we find it persuasive that a different division of our court recently upheld almost identical statements by the same trial court in *People v. Ingram*, 401 Ill. App. 3d 382 (2010),

finding that the court had not violated Rule 431(b). Thus, we find no error in the trial court's questioning regarding the *Zehr* principles that it explained.

Even if we had determined that the trial court had erred, that error would not rise to the level of plain error. When reviewing for plain error, "defendant bears the burden of persuasion as to whether the error was prejudicial to his case; and, if that burden is not met, defendant's conviction will stand." *People v. Willis*, 402 Ill. App. 3d 47, 53-54 (2010) (citing *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005)). We find that defendant has failed to show that if the trial court erred, the error was prejudicial to his case, because the evidence was not closely balanced, and the error was not so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process.

Defendant argues that the multiple errors in the case, along with the closely balanced evidence, makes the court's *Zehr* violation reversible error requiring a new trial.[8] We do not find this argument persuasive. First, we have found that the trial court did not err in the other aspects of the case challenged on appeal, and so any reversal would have to be based on the closeness of the evidence. Defendant argues that the evidence was closely balanced "as it came down to a credibility determination between the complainant and Ware." In support of his argument, defendant cites *People v. Naylor*, 229 Ill. 2d 584 (2008). In that case, our supreme court noted that the evidence was closely balanced because it depended on testimony between police officers

---

[8] In his reply brief, defendant abandons his argument for reversal under the second prong of plain error based on the Illinois Supreme Court's decision in *People v. Thompson*, No. 109033 (Ill. Oct. 21, 2101), which was decided while this case was pending.

and the defendant as to whether defendant sold the officers drugs. *Naylor*, 229 Ill. 2d at 607. However, there, the court held that "[g]iven these opposing versions of events, *and the fact that no extrinsic evidence was presented to corroborate or contradict either version*, the trial court's finding of guilty necessarily involved the court's assessment of the credibility of the two officers against that of defendant." (Emphasis added.) *Naylor*, 229 Ill. 2d at 607. Here, there was evidence to corroborate or contradict the different versions of what occurred. There was testimony from Snow and several police officers, photographs showing blood, and a bloody butcher knife recovered inside defendant's apartment. All of the evidence showed that defendant did use a knife and stab the victim. Thus, we cannot say that the evidence was so closely balanced that any *Zehr* violation tipped the scales. Additionally, as defendant acknowledges in his reply brief, absent any evidence that a *Zehr* violation resulted in a biased jury, the error did not affect the fairness of defendant's trial or challenge the integrity of the judicial process. See *Thompson*, slip op. at 12. Based on the record in this case, we do not find that the trial court violated Rule 413(b), but even if it did, the error would not rise to the level of plain error.

## CONCLUSION

First, defendant was not denied his sixth amendment right to counsel because the trial court did not violate Rule 401(a). Second, the trial court would not have abused its discretion in denying defendant standby counsel. Third, the trial court did not violate Rule 431(b) but even if it had, that error would not have risen to the level of plain error.

Affirmed.