NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 180806-U

NO. 4-18-0806

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 26, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| JERRY D. HARRIS, | ) | No. 17CF1253 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| | ) | Judge Presiding. |
| | ) | |

---

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding defendant's right to a speedy trial was
not violated, any error in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012)
admonishments was not sufficient to constitute plain error, and the trial court's
*Krankel* inquiry was sufficient.

¶ 2    On August 29, 2017, defendant, Jerry D. Harris, was charged with the offenses of

attempt (first degree murder), a Class X felony with special sentencing provisions (count I) (720

ILCS 5/8-4(a), (c)(1) (West 2016)); aggravated battery with a firearm, also a Class X felony

(count II) (720 ILCS 5/12-4.2(a)(1) (West 2016) (recodified as 720 ILCS 5/12-3.05(a)(1)));

aggravated discharge of a firearm, a Class 1 felony (count III) (720 ILCS 5/24-1.2(a)(2) (West

2016)); and being an armed habitual criminal, a Class X felony (count IV) (720 ILCS 5/24-1.7(a)

(West 2016)), for the shooting of Sedrick Cunningham on July 29, 2017, in Decatur, Illinois.

After several continuances by the State and the defense, and after defendant had been released on his own recognizance and later rearrested, he eventually went to jury trial on counts I and II on August 21 and 22, 2018. The jury returned verdicts of guilty on both counts and found the aggravating factor that "defendant personally discharged a firearm that proximately caused great bodily harm to [the victim] was proven." Defendant filed a "Motion for New Trial," arguing the ineffective assistance of trial counsel, and the trial court conducted a "pre-inquiry *Krankel* hearing" (see *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)), ultimately deciding defendant's claims did not amount to ineffective assistance. Defendant's posttrial motion was heard and denied, and the trial court sentenced defendant to 12 years on count I (attempt (murder)), with a 25-year add-on due to the aggravating factor, for a total of 37 years at 85%, and 3 years of mandatory supervised release. Defendant's motion to reconsider was later denied, and this appeal follows.

¶ 3                                  I. BACKGROUND

¶ 4            On July 29, 2017, in the early afternoon, Sedrick Cunningham was shot while standing in the 1000 block of Cerro Gordo Street in Decatur, Illinois. The shooter, known to Cunningham only as "Little C" and later identified as defendant, pulled up in a light blue Mercury Grand Marquis and began having words with Cunningham. The conversation escalated to an argument, and Cunningham struck defendant in the jaw, after which Cunningham said defendant produced a handgun and shot Cunningham in the left side. Once at the hospital, Cunningham told police what happened and identified defendant from a photo lineup. He said he had known defendant for "five, six" years and, although they were not friends, they "associated around people that we had mutual people that we hung around." Although he did not know defendant's name at the time, Cunningham said he learned defendant's name from friends who

had conducted an internet search. He identified defendant in open court as the person he knew as "Little C" and the person who shot him.

¶ 5 Defendant asserted an alibi defense from the beginning, filing a supplemental discovery response at the outset of the case which disclosed his location as other than the scene of the shooting, and he identified the witnesses who would corroborate his alibi.

¶ 6 Defendant was arrested on August 24, 2017, and arraigned on August 29, with the public defender appointed on his behalf. The matter was set for a preliminary hearing on September 20, and pretrial was set for November 21, 2017. At the November 21 pretrial, another attorney was standing in for the public defender representing defendant, and when asked about a possible jury trial date in February, counsel stated: "Well, he asked for the earliest available date. He's said that discovery is completed and he's disclosed alibi witnesses, so—" The trial court then indicated "that the defendant demands earliest jury trial date" and set the case for trial on January 9, 2018. Counsel did not object. On December 26, defendant filed a *pro se* handwritten "Motion for Speedy Trial (120-day)," which was stricken in January as moot since defendant had counsel at the time. The State filed a motion to continue on January 5, 2018. At the hearing on the motion, the State made representations that defendant was on "day 56" of his 120-day speedy trial term. Defendant's counsel said, "I think it's a few more days than that, but we're still not approaching the 120." The court noted his objection and granted the continuance. After discussion with counsel, the court asked, "So you want me to reset it for February 13th?" to which the State agreed and defendant's counsel responded, "[t]hat would be fine." On January 23, defendant filed another *pro se* motion, this time seeking dismissal of his charges pursuant to "725 ILCS 5/114-1," claiming his speedy trial term had run as of December 19, 2017, which motion was again stricken as moot since he was still represented by counsel.

¶ 7        On February 9, 2018, defendant was released from custody on his own recognizance due to ongoing medical issues and an upcoming medical procedure necessitating a delay in trial. His bond was later revoked, and he was reincarcerated, but from that point on, defendant made no demand for speedy trial as the case was continued for a variety of reasons and eventually proceeded to trial on August 21, 2018.

¶ 8        During jury selection, the court conducted its *Zehr* questioning thusly:

"I'm going to attempt to explain some constitutional principles. For this series of questions I have to be careful make [*sic*] a very precise record. So, I'll either have [*sic*] put up your hand or not put up your hand.

First question, the defendant is presumed to be innocent of the charges against him. This presumption remains with the defendant throughout the trial and is not overcome, unless by your verdict, you find that the State has proven the defendant guilty beyond a reasonable doubt.

Is there anybody here who has any difficult [*sic*] or disagreement with this proposition of law, the presumption of innocence. If so, please put up your hand? And let the record reflect that there are no raised hands.

Next question, the State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains upon the State throughout the trial. Does anybody have a difficulty or disagreement with this proposition of law, the burden of proof?

If so, please put up your hand. And, again, let the record reflect that there are no raised hands.

Next question, the defendant is not required to offer any evidence on his own behalf. Does anybody have a difficulty or disagreement with this principle of law? If so, please put up your hand. And, again, let the record reflect there are no raised hands.

And final question, at least of this type, if the defendant does not testify it cannot be held against him. Does anybody have any difficult [*sic*] or disagreement with this proposition of law, the right to remain silent. If so, please put up your hand. And, again, let the record reflect there are no raised hands. And let the record reflect there are no raised hands. And let the record reflect that all of the jurors understand and accept the *Zehr*, Z-E-H-R principles.

All jurors, can all of you promise me that you will follow the law, even though you may not personally agree with the law? Please answer out loud."

¶ 9      Defendant did not object or seek different or additional questioning by the court.

¶ 10                          A. The Trial

¶ 11      At trial, Cunningham described how the encounter with defendant occurred, how it escalated to a point where he hit defendant "in the jaw" as defendant sat in the light blue Mercury Grand Marquis he was driving, and how defendant then produced a gun and shot him in the left side. Cunningham said defendant then fled the area and Cunningham was taken to the hospital by a couple of friends. Cunningham acknowledged having consumed alcohol on the day

of the shooting and agreed he was "a little bit [intoxicated]." He also admitted to previous convictions in 2008 and 2015 for driving while his license was revoked, and aggravated battery in 2011. Once he was taken to the hospital, Cunningham gave a statement to the police and readily identified defendant from a computer-generated photo lineup.

¶ 12    By the time of the shooting, Cunningham said, he and defendant had some form of contact between 5 and 10 times, and at trial he was "one hundred percent certain" of his in-court identification of defendant as the shooter. Cunningham told Officer Kyle Patten, a Decatur police officer he spoke with at the hospital, that the shooter was known to him as "Little C," whom he described as being "a black male about 35 to 40 years old, short in height, with the stocky build and dreadlock style hair." When Officer Patten ran the nickname "Little C" through "RMS," the police department database, the only name that came up in the Decatur area was defendant's. When Detective Brad Hall spoke with Cunningham in the emergency room, he also identified the shooter as "Little C," who he said was 37 years old, "a dark complected, black male, shorter, stocky build, wearing a white tank top and jeans," and who had "dreads."

¶ 13    The State also called Lieutenant Christopher Thompson of the Macon County Sheriff's Office, who oversaw the jail. Lieutenant Thompson was familiar with and identified two book-in cards for defendant, one from August 25, 2016, listing his aliases as "Little C" "C," or "C West," and the other from August 23, 2017, the date of his arrest in this case, listing his age as 36, height—five foot six, weight—one hundred eighty pounds, and dark complexion. The accompanying photograph showed defendant to have "dreadlock style hair." Detective Eric Matthews testified to his administration of the computer-generated photo lineup and how Cunningham identified defendant as the shooter as well.

¶ 14    To establish defendant's connection with the light blue Mercury Grand Marquis,

the State called several witnesses. Detective Hall testified Cunningham described the shooter's vehicle as a "sky blue, four door, and it reminded him of a Mercury, possibly a Mercury." Detective Troy Kretsinger, a 21-year veteran with the Decatur Police Department, described how he encountered a "lighter blue, maybe robin's egg" blue 1999 Grand Marquis parked at the home of defendant's mother, Vera Carter, between March 6 and March 8, 2017, while he was investigating an unrelated matter. According to Kretsinger, Carter indicated defendant lived there "occasionally." When Kretsinger ran the license plate information, he found the vehicle to be registered to Ronald Patterson. Kretsinger also described police radio traffic he monitored on April 10, 2017, indicating the same vehicle was involved in a short car chase which resulted in a traffic stop where defendant was found sitting in the passenger seat. Ronald Patterson, a convicted felon who was, at the time of trial, in custody on an unrelated matter, testified he sold a "baby blue" "Merc" to defendant, whom he only knew and identified in open court as "Little C," for cash sometime before the April 10, 2017, traffic stop. According to Patterson, no formal paperwork was ever completed on the transaction other than signing over the title, and Patterson said defendant "wanted to use my plates." Detective Scott Marquis was the Decatur officer involved in the traffic stop of the light blue Mercury Grand Marquis on April 10, 2017. He testified the vehicle fled when he attempted to initiate the stop and was later located with defendant sitting in the passenger seat. At the time, the car was still registered to Patterson.

¶ 15        The fact Cunningham was shot was not contested, and stipulations were read to the jury confirming he had a gunshot wound from a .25-caliber bullet. He suffered a single gunshot wound to the left anterior chest, and the internal injuries were considered "life threatening."

¶ 16        Detective Kretsinger also testified about his evidence collection at the scene of the

shooting. Although Cunningham had described "eight to ten" people being present on Cerro Gordo Street at the time of the shooting, Kretsinger acknowledged that when he arrived on the scene, "there were not witnesses available to cooperate" with his investigation. Describing this particular location to be "a pretty high crime area. A lot of drug activity, shots fired, incidents, things of that nature," when he started searching for physical evidence he found several fired projectiles in the roadway, along with fired shell casings on the north side of the street. He said the casings appeared to be weathered, evidencing their presence for "some period of time," and none of them were the caliber of the firearm that shot Cunningham.

¶ 17 Defendant elected not to testify, and the defense presented brief testimony from Detective Jason Kuchelmeister to impeach Cunningham on the issue of whether he talked to the detective and told him he fell to the ground after he was shot or "ducked behind a car." The defense also called Milan Brown, the father of three children by defendant's sister, to testify as an alibi witness. Brown said defendant was at his sister's residence with other family members on the day of the shooting from 8 or 9 in the morning until 10 or 11 that night. According to Brown, other than when defendant, Brown, and defendant's sister went to Burger King at "about one or three o'clock," defendant did not leave. On cross-examination, Brown admitted he never contacted the police with this information and spoke about it for the first time with defendant's counsel on November 6, 2017, when he consented to be interviewed. He denied ever being contacted by the police to give a statement or knowing they were attempting to contact him. He admitted his felony drug conviction from 2012. The State's rebuttal witness, Detective Kuchelmeister, testified to the unsuccessful efforts made to contact Brown at the address he provided defendant's counsel to obtain a statement.

¶ 18 After closing arguments and instructions, the jury deliberated for approximately

two and a half hours before returning verdicts of guilty on both attempt (first degree murder) and aggravated battery with a firearm. They also found the aggravating factor had been proven, concluding that during the attempt, defendant personally discharged a firearm that proximately caused great bodily harm to Cunningham. The matter was referred to court services for a presentence investigation and report and set for sentencing later.

¶ 19                                    B. Posttrial Motions

¶ 20        Defendant filed a *pro se* "Motion for New Trial" in September 2018, in which he wrote: "I ask the Courts to take in mind the direct evidence as to the state of mind regarding what I believe at the time I acted in self-defense against the victim. It's my right to present evidence of a victims [*sic*] character for violence, when I acted in self-defense against the victim." He also made a claim of ineffective assistance of counsel based on counsel's (1) "failing to raise a viable theory of defense," (2) effectively conceding his guilt, (3) failing to investigate certain physical evidence, (4) failing to raise self-defense, and (5) failing to pursue a lesser charge "based upon an unreasonable belief in self-defense or sudden and intense passion." Later in September 2018, he also filed a *pro se* "Motion to Reconsider," which he said was based on a violation of both his statutory and constitutional right to a speedy trial. Defendant's counsel filed a posttrial motion in October 2018, claiming only that the evidence was insufficient to prove defendant guilty beyond a reasonable doubt.

¶ 21        When the matter was called for sentencing in October 2018, the trial court first addressed the *pro se* motion for a new trial. Considering the claims of ineffective assistance of counsel, the court conducted a "pre-inquiry *Krankel* hearing" to address defendant's allegations. The trial court informed defendant of the procedure—he would go through each allegation, allow defendant an opportunity to elaborate, and give counsel the opportunity to respond. The State

would not be a participant.

¶ 22    The court reiterated defendant's comment about acting in self-defense and his right to present evidence of a victim's character for violence when alleging self-defense, as well as defendant's claimed right to the victim's other-crimes evidence, but it also noted these assertions were not actually directed against his counsel. The court then identified the allegations of ineffective assistance, *i.e.*, failing to raise a viable theory of defense and effectively conceding his guilt, which the court considered his first allegation, and asked defendant to elaborate. The inquiry then proceeded as follows:

"[DEFENDANT]: There was a lot of things that didn't get brought up in my trial that was supposed to.

THE COURT: All right. Can you be any more specific than that Mr. Harris?

[DEFENDANT]: Like Mr. Cunningham had a gun too. But it was never brought up that he had a gun. It was just like—

THE COURT: Well, here, I want to try to stay focused on this allegation. You say Mr. Tighe failed to raise a viable theory of defense, which would be like self[-]defense or some other affirmative defense.

[DEFENDANT]: Yes.

THE COURT: And effectively conceded my guilt. That's what I'm asking you about Mr. Harris.

[DEFENDANT]: Yes, I mean, it was plain and clear to see that I acted in self[-]defense.

- 10 -

THE COURT: All right. Mr. Tighe, your response.

MR. TIGHE: Um—[defendant's] position, from the beginning, was that he didn't do it. And he had an alibi and was somewhere else. So I never discussed self-defense 'cause he never said he'd done it. Our defense was the alibi defense."

¶ 23    The trial court recalled having heard from at least one alibi witness, as confirmed by counsel. The court continued:

"THE COURT: Okay. All right. And that was the defense really from the start to the finish that he wasn't present. He didn't do it. Correct, Mr. Tighe?

MR. TIGHE: That is correct.

THE COURT: All right. Very well. Then the next allegation is Mr. Tighe did not investigate certain physical evidence. Mr. Harris, what are you talking about there? Do you want to say anything further?

[DEFENDANT]: Like there was a lot he didn't do. Like for one, he ain't—he ain't getting no records. My nickname was—I'm not the only Little C person that's called that nickname in the records."

¶ 24    Defendant then began explaining how at some point at "the beginning of the case," Cunningham said the person who shot him was the same person who had stabbed him, and defendant wanted it made clear, "I've never been to jail for no knife altercation, none of that, against dude [(Cunningham)]." He claimed Cunningham had "a personal vendetta" against him.

- 11 -

The trial court then inquired:

"THE COURT: So, you're stating that the victim really did not know you. And the nickname he referred to you as, Mr. Tighe, could have investigated and figured out that that was, in fact, not yourself. Is that correct Mr. Harris?

[DEFENDANT]: Exactly. He made like three statements.

THE COURT: Okay, All right. Mr. Tighe, your response.

MR. TIGHE: All I can respond is that, again, Mr. Harris insisted from the beginning it wasn't him. He didn't do it. He was being misidentified. And our defense at trial was the alibi that he wasn't there.

THE COURT: Do you recall discussing with him, with Mr. Harris, at all Mr. Tighe, the nickname that he was identified by?

MR. TIGHE: I didn't—I did not, Your Honor.

THE COURT: Okay. Very well. And then really the final allegation is furthermore counsel could have raised self[-]defense or could have pursued a lesser charge, based on an unreasonable belief of self[-]defense or sudden intense passion."

¶ 25 The trial court noted how those "are really two separate things," with self-defense being an affirmative defense, and a lesser charge, such as second-degree murder, being based on defendant's claim he was acting under either a "sudden intense passion or [his] belief that *** [he] needed to act in self-defense was unreasonable." The court then asked defendant if he had any further clarification:

"[DEFENDANT]: I mean, if somebody walked up to you and get to swinging and punching in your car and up a gun what would you do?

THE COURT: Okay. So, essentially, you're stating, based on that, Mr. Tighe, should have asserted the affirmative defense of self[-]defense or at least submitted a lesser included instruction for second degree murder. Is that right, Mr. Harris?

[DEFENDANT]: Yes.

THE COURT: Okay. Mr. Tighe—

[DEFENDANT]: Something.

THE COURT: Again your response.

MR. TIGHE: It's the same. From the beginning his position was that he didn't do it. He wasn't there.

THE COURT: Okay.

MR. TIGHE: So, he couldn't have acted in self[-]defense if he didn't do it.

[DEFENDANT]: Can I speak?

THE COURT: Mr. Tighe, did you ever discuss with Mr. Harris submitting a lesser included instruction?

MR. TIGHE: I did not.

THE COURT: Okay. And was that, again, based on his position from the start, that it wasn't him, he wasn't there, he had an alibi?

MR. TIGHE: That's correct."

¶ 26        The trial court then stated it had considered the statements of defendant as well as the responses of counsel and found, "the defendant's allegations do not amount to ineffective assistance of counsel." The court noted, based on defendant asserting he was not present, it was not him, and it was someone else, his attorney raised an alibi defense on his behalf and presented evidence to that effect. Unfortunately, the jury was not persuaded, and the court found all of defendant's claims centered around that fact. The court denied defendant's posttrial motion and proceeded to a sentencing hearing.

¶ 27                              C. Sentencing Hearing

¶ 28        The trial court found count II, the aggravated discharge of a firearm count, merged for purposes of conviction with count I, the attempt (first degree murder) count. After the evidence and arguments of counsel, the court sentenced defendant to 12 years on the attempt conviction with the minimum 25-year add-on for the aggravating factor, for a total of 37 years. Defendant's motion to reconsider his sentence argued only that "the sentence, in light of the offense and the Defendant's criminal record was excessive." The motion was denied and defendant appeals.

¶ 29                              II. ANALYSIS

¶ 30        Defendant raises three issues for review, claiming (1) he was denied the effective assistance of counsel when his attorney failed to file a motion for discharge for violation of his statutory speedy trial right, (2) the trial court's Rule 431(b) admonishments were not sufficient (see Ill. S. Ct. R. 431(b) (eff. July 1, 2012)), and (3) the trial court's *Krankel* inquiry was inadequate and the case should be remanded for a further hearing.

¶ 31                              A. Harris's Speedy Trial Claim

- 14 -

¶ 32    Section 103-5(a) of the Code of Criminal Procedure of 1963 provides, in relevant part:

> "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***. Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5(a) (West 2016).

¶ 33    Defendant couches an asserted violation of his statutory speedy trial right within the context of a claim of ineffective assistance of counsel by complaining counsel failed to move for his discharge. The issue of whether a defendant has received ineffective assistance of counsel is a mixed question of fact and law. *People v. Coleman*, 2015 IL App (4th) 131045, ¶ 66, 25 N.E.3d 82. As a result, we will defer to the trial court's findings of fact but review *de novo* the ultimate legal question of whether counsel's conduct supports an ineffective assistance claim. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55, 92 N.E.3d 544.

¶ 34    A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219, 808

- 15 -

N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 687). As the *Evans* court noted, effective assistance of counsel refers to competent, but not necessarily perfect, representation. *Evans*, 209 Ill. 2d at 220 (citing *People v. Stewart*, 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240 (1984)). To satisfy the second prong of *Strickland*, "[a] defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 229 Ill. 2d 1, 4, 890 N.E.2d 424, 426 (2008). The supreme court in *Houston* went on to define a "reasonable probability" as a probability which would be sufficient to undermine confidence in the outcome of the trial. *Houston*, 229 Ill. 2d at 4. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 35        As to this issue, the entirety of defendant's ineffectiveness claim rests on whether he was tried outside his statutory speedy trial term as provided in section 103-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(a) (West 2016)). If so, the failure of trial counsel to pursue discharge could well constitute ineffective assistance. See *People v. Staten*, 159 Ill. 2d 419, 431, 639 N.E.2d 550, 556-57 (1994) (collecting cases). Conversely, if defendant was not tried outside his term, there is no ineffectiveness issue. *People v. Phipps*, 238 Ill. 2d 54, 65, 933 N.E.2d 1186, 1192 (2010) (counsel's failure to assert a speedy trial violation cannot establish either prong of an ineffective assistance claim if there is no lawful basis for raising a speedy trial objection). Whether a defendant's statutory speedy trial rights were violated is a question of law, which this court reviews *de novo*. *People v. Van Schoyck*, 232 Ill. 2d 330, 335, 904 N.E.2d 29, 31-32 (2009).

¶ 36        Both defendant and the State agree the State was responsible for the time from his

arrest to November 21, 2017. The State's brief argues that time ran from August 29, the date he was charged, while defendant argues, and the court file reflects, he was arrested on August 23, so the time would begin running the next day (August 24, 2017). See section 1.11 of the Statute on Statutes, Computation of Time (5 ILCS 70/1.11 (West 2016)). Despite the disparity in starting dates for calculating the speedy trial term, they both found 90 days to have expired by November 21, 2017. Both parties also appear to agree defendant's 120 days would have run on December 22, 2017. No action was taken until the State's motion to continue on January 5, 2018, to which defendant objected. The trial court then proposed a February 13, 2018, trial date, which both sides accepted. They also agree the time between February 9, 2018, when defendant was released from custody, until the date of trial is not attributable to the State. As a result, what transpired on November 21 makes all the difference.

¶ 37     At the November 21 pretrial, defendant was represented by an attorney from the public defender's office who, from her comments and a review of the record, was not the attorney assigned to the case. When the trial court inquired about a possible jury trial date in February, counsel, obviously referencing defendant's assigned counsel, stated: "Well, he asked for the earliest available date. He's said that discovery is completed and he's disclosed alibi witnesses, so—" The court interjected for the court reporter to show "that the defendant demands earliest jury trial date" and set the case for trial on January 9, 2018. Defendant did not object to this trial date although, by all accounts, it was beyond the 120 days which would have otherwise expired on December 22, 2017.

¶ 38     In *People v. Cordell*, 223 Ill. 2d 380, 391-92, 860 N.E.2d 323, 331 (2006), our supreme court explained:

> "A simple request for trial, before any 'delay' is proposed, is not

equivalent to an objection for purposes of section 103-5(a).

[Citation.] As amended, section 103-5(a) places the onus on a defendant to take affirmative action when he becomes aware that his trial is being delayed. To allow basic requests for trial, made before any delay was even proposed, to qualify as objections to 'delays' not yet proposed would provide defendants with another sword to use after the fact to overturn their convictions. This does not comport with the intention of section 103-5(a)."

The *Cordell* court defined what constituted a relevant "delay" when it noted there is nothing in section 103-5(a) which says the "delay" must be of a set trial date. Instead, they said, "[a]ny action by either party or the trial court that moves the trial date outside of that 120-day window qualifies as a delay for the purposes of the section. To hold otherwise would contravene the purpose of the 120-day period of the section, which is to guarantee a speedy trial and not to open a new procedural loophole which defense counsel could unconscionably use to obstruct the ends of justice." (Internal quotation marks omitted.) *Cordell*, 223 Ill. 2d at 390.

¶ 39        Here, the attorney standing in for defendant's trial counsel merely relayed counsel's desire for the earliest possible trial date, and the trial court noted that fact. When the court proposed the new trial date, outside the 120 days, it was incumbent on counsel, either at that time or later, to raise an objection. See *People v. Lilly*, 2016 IL App (3d) 140286, ¶ 32, 53 N.E.3d 1028 (section 103-5(a) places the responsibility on a defendant to take affirmative action when he becomes aware his trial is being delayed). This would comport with the *Cordell* court's admonishment that a defendant is free to "employ section 103-5(a) as a shield against any attempt to place his trial date outside the 120-day period." *Cordell*, 223 Ill. 2d at 390. Instead,

defendant is looking for that "procedural loophole" to defeat his conviction. Defense counsel agreed to the proposed trial date offered at the November 21 hearing, thereby tolling the 120 days for the interim period. See *People v. Woodrum*, 223 Ill. 2d 286, 299, 860 N.E.2d 259, 269 (2006) (an agreed continuance tolls the speedy trial period).

¶ 40 At the January 5, 2018, hearing on the State's continuance motion, when discussing defendant's time in custody, after the State opined he was on "day 56" and the court noted it was a "fairly new case" filed "last fall," counsel responded: "It was. I think it's a few more days than that [referencing the State's calculation] but we're still not approaching the 120."

¶ 41 Although defense counsel's objection to the continuance was noted by the trial court, when the court proposed a February 13 trial date, both the State and defense agreed. At the time, the 120 days had not run and defendant's obligation to oppose the newly proffered trial date continued. "[W]here there are two reasons for the delay, one attributable to the State and the other to the defendant, 'the fact that the delay was partially attributable to the defendant will be sufficient to toll the statutory term.' " *Lilly*, 2016 IL App (3d) 140286, ¶ 31 (quoting *People v. Plair*, 292 Ill. App. 3d 396, 398, 686 N.E.2d 28, 31 (1997)). Defendant objected to the continuance, but since his agreement to the January 9 date tolled the 120-day clock, there was still time remaining. However, once he agreed to the February 13 trial date, he was in the same position as at the November 21 pretrial, agreeing to a trial date beyond the 120 days. *Lilly*, 2016 IL App (3d) 140286, ¶ 32.

¶ 42 Nothing after the January 5 hearing matters in the 120-day calculation because defendant was released from custody on February 9, never again asserted his right to a speedy trial, and acknowledges the same on appeal. As we noted above, both parties agreed 90 of the 120 days ran by the time of the November 21, 2017, pretrial. From then on, counsel's

acquiescence to the dates proposed by the trial court precluded the "clock" from ever starting again. *Cordell*, 223 Ill. 2d at 390. As such, defendant has no speedy trial issue. On appeal, however, he argues counsel's failure to assert his speedy trial rights constitutes ineffective assistance of counsel, which brings us back to where we started. There is no basis for arguing ineffective assistance of counsel for failing to raise a speedy trial claim if there was no speedy trial violation. *People v. Staake*, 2017 IL 121755, ¶ 47, 102 N.E.3d 217 (citing *Phipps*, 238 Ill. 2d at 65).

¶ 43                                  B. Rule 431(b) Admonishments

¶ 44            Whether a trial court has violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and if so, the effect of noncompliance, is reviewed *de novo*. *People v. Wilmington*, 2013 IL 112938, ¶ 26, 983 N.E.2d 1015; see also *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 37, 959 N.E.2d 693. The rule is simple—the trial court is to ask each prospective juror whether that juror understands and accepts the following principles:

> "(1) that the defendant is presumed innocent of the charge(s)
> against him or her; (2) that before a defendant can be convicted the
> State must prove the defendant guilty beyond a reasonable doubt;
> (3) that the defendant is not required to offer any evidence on his
> or her own behalf; and (4) that if a defendant does not testify it
> cannot be held against him or her[.]" Ill. S. Ct. R. 431(b) (eff. July
> 1, 2012).

Defendant contends the trial court's Rule 431(b) admonishments were not sufficient.

¶ 45            In this instance the trial court did not engage in the oft-cited basis for error of "collapsing" the four *Zehr* (*People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984)) principles

into one statement of law, recently addressed approvingly by our supreme court in *People v. Birge*, 2021 IL 125644. Instead, the trial court assiduously complied with Rule 431(b) by admonishing the venire about each of the principles individually. Unfortunately, the inquiry then deviated from that outlined in Rule 431(b), and rather than asking jurors if they "understand" and "accept" each principle, the court asked whether the jurors "have any difficulty or disagreement" with each proposition of law. After completing its inquiry in this fashion, the trial court then found "that all of the jurors understand and accept the *Zehr* *** principles," adding a final question: "[a]ll jurors can all of you promise me that you will follow the law, even though you may not personally agree with the law?" The court asked for and obtained a verbal response from the entire venire indicating they could.

¶ 46    As noted by the State, there was no objection to the trial court's manner of questioning. In addition, defendant raised no claim of error concerning Rule 431(b) admonishments in either of his *pro se* posttrial motions, nor did his retained counsel in his written posttrial motion. This would normally be sufficient to find defendant has procedurally forfeited the issue. *People v. Belknap*, 2014 IL 117094, ¶ 47, 23 N.E.3d 325.

¶ 47    Seeking to save himself from procedural forfeiture by relying on "plain error," defendant contends the admonishments were error and the evidence was close, thereby meeting the first prong of a plain-error analysis. See *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 58 (forfeited errors may be reviewed under the plain-error doctrine " 'where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant' " (quoting *Belknap*, 2014 IL 117094, ¶ 48)).

¶ 48    The State concedes the admonishments were error but argues the evidence was not close, and as a result, plain error does not apply. We find ourselves required to conduct this

analysis once again because of the language used during Rule 431(b) admonishments. It remains difficult to understand how such " 'clear and unambiguous' " language as that contained in Rule 431(b) continues to be a problem. *People v. Bell*, 2020 IL App (4th) 170804, ¶ 106, 145 N.E.3d 740 (quoting *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010)). "The court shall ask each potential juror, individually or in a group, whether that juror *understands* and *accepts* the following principles ***." (Emphases added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Our supreme court has interpreted the language of Rule 431(b) to mandate a "specific question and response process." *Thompson*, 238 Ill. 2d at 607. "The trial court must ask each potential juror whether he or she *understands* and *accepts* each of the principles in the rule." (Emphases added.) *Thompson*, 238 Ill. 2d at 607.

¶ 49        Any time trial courts stray from this language, problems ensue. Trial courts could go far in alleviating the frequency with which this issue is raised by merely following the language of the rule. The procedure used here failed to comply with the requirements of Rule 431(b) and the directives of our supreme court.

¶ 50        Other appellate districts have found various alternatives sufficient. In *People v. Atherton*, 406 Ill. App. 3d 598, 611, 940 N.E.2d 775, 787 (2010), for example, the Second District found asking jurors if they "have any difficulty" with a particular proposition "was just another way of asking if they understood those propositions," and asking jurors if they were "were willing to follow" the propositions was simply another way of asking if they accepted them. In *People v. Ware*, 407 Ill. App. 3d 315, 356, 943 N.E.2d 1194, 1228 (2011), the First District found asking jurors if they had any "difficulty" with the principles was sufficient since it encompasses both "understanding" and "acceptance." We have gone so far as to conclude "follow" equals "accept." See *People v. Hartfield*, 2020 IL App (4th) 170787, ¶ 58. However,

most recently, in *People v. Banks*, 2021 IL App (4th) 180838-U, ¶ 40, we addressed this identical form of *Zehr* admonishment by the same trial court and found, "it is the law that asking potential jurors whether they disagree with a *Zehr* principle *fails* to fulfill the obligation to ask them whether they *understand* the principle."(Emphases in original.). We further found the trial court's inquiry into whether potential jurors had any "difficulty or disagreement" with the *Zehr* principles was clear error. *Banks*, 2021 IL App (4th) 180838-U, ¶ 41. Although we did not address it then, we do so here. Asking jurors if they had "difficulty" or "disagreement" with each proposition and then concluding their responses indicated "that all of the jurors understand and accept the *Zehr* *** principles" is not the procedure outlined in Rule 431(b), and to our knowledge, it has not been approved by any court of review. It is for the jurors to indicate whether they "understand" and "accept," not for the trial court to make a finding they do so based on a different inquiry.

¶ 51 Trial courts need to understand the dilemma this creates for reviewing courts. As our supreme court noted in *People v. Sebby*, 2017 IL 119445, ¶ 53, 89 N.E.3d 675, "That standard [(closely balanced evidence)] seems quite simple, but the opposite is true. A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility."

¶ 52 Our colleague, Justice Steigmann, aptly noted the problems inherent in this situation in *People v. Neal*, 2020 IL App (4th) 170869, ¶ 196, 150 N.E.3d 984:

> "Whenever a reviewing court concludes that reversal is
> required because (1) the trial court failed to comply with Rule
> 431(b) and (2) the evidence of defendant's guilt is closely
> balanced, that reversal is due to judicial malpractice. And

- 23 -

prosecutorial malpractice, if the prosecutor stood idly by and permitted this easily corrected judicial error to go unchallenged. The prosecutor is the one responsible for protecting the record and must be on high alert to ensure it does not contain any obvious errors. There is scarcely a clearer, more obvious, and more easily correctible error than a trial court's failure to precisely comply with Rule 431(b)."

¶ 53 He went on to note one possible outcome arising from erroneous Rule 431(b) admonishments—the forced retrial, if even possible, of a defendant convicted of an egregious crime solely because of botched *Zehr* admonishments and a closely balanced case. The actual likelihood of a jury's decision being somehow affected by bad *Zehr* admonishments may not be substantial, but the possibility it could be found to be outcome-determinative in a close case, leading to an overturned conviction and the inability to retry a defendant for horrendous crimes, is far more realistic, yet it all could be avoided by properly asking jurors if they *understand* and *accept* each of the four *Zehr* principles.

¶ 54 Since that did not happen here, we must consider the closeness of the evidence. Sedrick Cunningham readily identified defendant, whom he knew only as "Little C," from a photo lineup while in the hospital after the shooting. He said he had known defendant for "five, six" years, and although they were not friends, they had mutual friends with whom they associated, and he had some form of contact with defendant between 5 and 10 times before the shooting. By the time of trial, he learned defendant's name from friends who conducted an internet search. Cunningham identified defendant in open court as the person he knew as "Little C," and at trial he was "one hundred percent certain" of his in-court identification of defendant

- 24 -

as the shooter. Defendant's name was the only person to whom that nickname returned in a search of the Decatur police database.

¶ 55    In addition, Cunningham provided the police with a physical description that came very close to matching that of defendant. Cunningham described "Little C" to Officer Patten at the hospital as being "a black male about 35 to 40 years old, short in height, with the stocky build and dreadlock style hair." When Detective Hall spoke with Cunningham in the emergency room, he also described "Little C" as 37 years old, "a dark complected, black male, shorter, stocky build, wearing a white tank top and jeans," who had "dreads." Lieutenant Thompson of the sheriff's office identified two book-in cards for defendant, one an alias of "Little C," and the other from the date of his arrest in this case, listing his age as 36, height—five foot six, weight—one hundred eighty pounds, and dark complexion, with an accompanying photograph showing defendant had "dreadlock style hair."

¶ 56    This, however, was not the only evidence against defendant at trial. Cunningham said at the time of the shooting defendant was driving a "[l]ight blue Merc, I think, a Grand Marquis." Detective Hall testified Cunningham described the shooter's vehicle as a "sky blue, four door, and it reminded him of a Mercury, possibly a Mercury." Ronald Patterson, a convicted felon, testified he sold a "baby blue" "Merc" to defendant for cash sometime before April 10, 2017. At trial, he identified defendant, whom he knew only as "Little C," as the person to whom he sold the car. Patterson said no formal paperwork was completed other than signing over the title, and he testified that defendant "wanted to use my plates." Detective Kretsinger said he saw a "lighter blue, maybe robin's egg" blue 1999 Grand Marquis parked at defendant's mother's house between March 6 and March 8, 2017, during an unrelated investigation and she told him defendant lived there "occasionally." Kretsinger said the license plates came back registered to

Ronald Patterson. Detective Marquis said a light blue Mercury Grand Marquis fled from him on April 10, 2017, as he attempted to conduct a traffic stop and, when found later, defendant was sitting in the passenger seat. The car was still registered to Patterson.

¶ 57      In contrast, the only occurrence witness for the defense was Milan Brown, the father of defendant's sister's children. He provided an alibi for defendant for the day of the shooting. However, when speaking with the police during defendant's arrest, he failed to mention this to them then or at any later time. In fact, according to Brown, he did not tell anyone until speaking with defendant's attorney over two months after defendant was arrested. On cross-examination, Brown acknowledged having given a statement to defendant's counsel in November 2017, and the State presented testimony concerning the unsuccessful efforts made to speak with Brown before the trial in August 2018.

¶ 58      "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Having done so, we find the evidence was not closely balanced. Defendant's alibi witness, a convicted felon who was tangentially related, said they were together at defendant's sister's house all day, with little elaboration or explanation. In fact, his direct examination took up less than three pages of the transcript. Apparently, counsel wanted to "get in and get out," a tactic with which any seasoned trial counsel can empathize when they are tendering a questionable witness. This becomes more understandable when, during defendant's *Krankel* hearing, he essentially confirms any alibi evidence was false by admitting he did, in fact, shoot Cunningham, but that it was in self-defense, claiming counsel was ineffective for failing to assert the same.

¶ 59      This is not the equally credible, conflicting testimony the supreme court described

in *Sebby*. There is nothing in this record to support a finding that the evidence was " 'so closely balanced that the error alone threatened to tip the scales of justice against the defendant.' " *Sebby*, 2017 IL 119445, ¶ 48 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007)) .

¶ 60                         C. Inadequate *Krankel* Hearing

¶ 61        Lastly, defendant contends the case should be remanded for a further *Krankel* inquiry, maintaining he had additional unaddressed claims of ineffective assistance. One would have thought, after reading the transcript, defendant would have preferred to forget the *Krankel* hearing, which could best be described as a textbook example of why efforts at self-representation in a criminal case are frequently a bad idea. Instead, he chooses to draw attention to his disastrous admission and then argues he did not get an adequate opportunity to address his claims.

¶ 62        The procedure which has developed from *Krankel* governing *pro se* claims of ineffective assistance of counsel " 'serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance [of counsel] claims.' " *People v. Jackson*, 2020 IL 124112, ¶ 95, 162 N.E.3d 223 (quoting *People v. Patrick*, 2011 IL 111666, ¶ 39, 960 N.E.2d 1114). It is intended to limit appeal issues by addressing ineffectiveness claims in the trial court. *Jackson*, 2020 IL 124112, ¶ 95. New counsel is not automatically appointed; instead, the trial court first examines the factual basis of the claim and determines whether the claim lacks merit or pertains to matters of trial strategy. If so, then the court may deny the motion without the appointment of new counsel. *People v. Jolly*, 2014 IL 117142, ¶ 29, 25 N.E.3d 1127.

¶ 63        Whether the trial court conducted a proper *Krankel* preliminary inquiry presents a

question of law that we review *de novo*. *Jackson*, 2020 IL 124112, ¶ 98. If the trial court's inquiry was properly conducted and the court decided the merits of defendant's claim, we will reverse only if the trial court's actions constitute manifest error, or error that is clearly evident, plain, and indisputable. *Jackson*, 2020 IL 124112, ¶ 98. "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Jackson*, 2020 IL 124112, ¶ 97.

¶ 64        Our first concern, on review, is to ascertain whether the trial court conducted an adequate inquiry into defendant's *pro se* claims of ineffective assistance. *Jackson*, 2020 IL 124112, ¶ 98. Once a defendant raises such claims, the trial court is expected to conduct "some type of inquiry into the underlying factual basis, if any." (Internal quotation marks omitted.) *People v. Ayres*, 2017 IL 120071, ¶ 11, 88 N.E.3d 732. In *Ayres*, our supreme court told us the inquiry must be " 'sufficient to determine the factual basis of the claim' " and consist of " 'some interchange' " between the court, trial counsel, and the defendant concerning the facts and circumstances surrounding the allegations, discussing the allegations with the defendant, and inquiring of trial counsel about the defendant's claims. *Ayres*, 2017 IL 120071, ¶¶ 11-12 (quoting *People v. Banks*, 237 Ill. 2d 154, 213, 934 N.E.2d 435, 468 (2010), and *Jolly*, 2014 IL 117142, ¶ 30).

¶ 65        Defendant's motion for a new trial, asserting his ineffective assistance of counsel claims, first asked the trial court "to take in mind the direct evidence as to the state of mind regarding what I believe at the time I acted in self-defense against the victim." This undoubtedly was a surprise to the court, if not to defense counsel as well, since defendant claimed an alibi throughout and presented testimony to that effect at trial. The entirety of his ineffective assistance claims were contained in the next paragraph:

- 28 -

"I also like to raise Ineffective assistance counsel [*sic*] for failing

to raise a viable theory of defense and effective, [*sic*] conceded my

guilt; investigate certain physical evidence. Furthermore, Counsel

could have raised self-defense or could have pursued a lesser

Charge based upon an unreasonable belief in self-defense or

sudden or intense passion. [citing portions of 720 ILCS 5/7-1(a),

use of force in defense of person]."

¶ 66        The transcript of the hearing on defendant's motion reveals the trial court engaged

in a painstaking inquiry of each allegation raised, asking defendant if he wished to explain his

claim or say anything further about it, and afterwards, asking defendant to confirm the trial

court's summarization of what it understood his claim to be. Once that was completed, the court

asked defense counsel to respond. As defendant elaborated on his claims, or on other complaints

he had, the trial court redirected him at times, asking for specifics, and asking if he had anything

further to say.

¶ 67        We are asked to speculate on what defendant meant by "Can I speak?" This

question arose after defendant claimed his counsel was ineffective for failing to raise

self-defense as an affirmative defense or submit a lesser included instruction for second-degree

murder. It came immediately after his trial counsel again mentioned, "from the beginning his

position was that he didn't do it. He wasn't there." and "So, he couldn't have acted in

self-defense if he didn't do it." The trial court found defendant's claims did not amount to

ineffective assistance, noting he asserted an alibi "from the start" and even presented an alibi

witness. We cannot surmise defendant was going to be able to add anything likely to clear up the

fact he was either lying before the court now or had presented perjured testimony from his alibi

witness at trial. Either way, the court had addressed each of the claims he raised in his motion, and even on appeal defendant fails to assert what additional claims he had.

¶ 68    Based on this record, the finding of the trial court that defendant's claims lacked merit was not manifestly erroneous. *People v. Lobdell*, 2019 IL App (3d) 180385, ¶ 10, 141 N.E.3d 304. There is no basis to find he is entitled to any further *Krankel* inquiry.

¶ 69                          III. CONCLUSION

¶ 70    For all these reasons we affirm the judgment and sentence of the trial court.

¶ 71    Affirmed.